**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **BRUCE M. BRADFORD** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 11 C 37** |
| ) | |
| **VILLAGE OF LOMBARD, POLICE** ) | **Magistrate Judge Finnegan** |
| **CHIEF RAY BYRNE, individually, and** ) | |
| **BOARD OF FIRE AND POLICE** ) | |
| **COMMISSIONERS OF THE VILLAGE OF** ) | |
| **LOMBARD,** ) | |
| ) | |
| **Defendants.** ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Bruce M. Bradford claims that Defendants the Village of Lombard (the "Village") and Police Chief Ray Byrne ("Chief Byrne"), in his individual capacity, caused his termination as a police officer in retaliation for filing a prior lawsuit for unpaid overtime under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* This retaliation claim (Count I) will proceed to trial for determination by a jury.  Plaintiff also seeks administrative review of the decision by Defendant Board of Fire and Police Commissioners of the Village of Lombard (the "Board") to terminate him following an evidentiary hearing (Count II). He argues that the decision should be overturned because several of the Board's findings are against the manifest weight of the evidence, and there was insufficient basis to discharge him for cause.  After careful review of the record, the Court affirms the Board's decision to discharge Plaintiff from the Lombard Police Department.

<u>**BACKGROUND**</u>[1]

**A.  Overview**

Plaintiff became a police officer with the Lombard Police Department ("LPD") in 1998.  In August 2009, he filed a lawsuit against the Village under the FLSA, seeking compensation (and liquidated damages) for hours spent caring for a police canine in his home after his shift each day.  (Case No. 09 C 4777).  The parties settled that lawsuit in April 2010 and the case was dismissed with prejudice on June 29, 2010.

Eleven days later, on July 9, 2010, Chief Byrne filed formal charges against Plaintiff with the Board.  The charges alleged, among other things, that Plaintiff had violated LPD Standards of Conduct by leaving the scene of an accident on March 20, 2010.  There is no dispute that on that date, Plaintiff momentarily lost control of his personal vehicle, a Dodge Ram pickup truck, in slippery conditions.  The truck jumped a curb and struck a fire hydrant, damaging both the hydrant and the vehicle.  Two witnesses in a nearby vehicle called 911 to report the incident and the license plate of Plaintiff's pickup truck.  LPD Sergeants Marilyn A. Gabinski and William Marks immediately began an investigation of the incident, interviewing Plaintiff and the two witnesses, and gathering other evidence.  In addition, on March 24, 2010, Chief Byrne assigned Lieutenant Tom Wirsing of the Investigations Division to conduct an internal investigation of Plaintiff.  Lt. Wirsing interviewed the two witnesses again, and spoke with Sgt. Gabinski and Sgt. Marks.  He and Lieutenant Scott Watkins also formally interrogated Plaintiff on May 10, 2010 and this was recorded and transcribed ("the

---

[1]     The following evidence is drawn from the administrative record.  *See Pisano v. Giordano*, 106 Ill. App. 3d 138, 140, 435 N.E.2d 899, 901 (4th Dist. 1982) (citing 735 ILCS 5/3-110) ("A judge sitting in an administrative review proceeding is expressly forbidden to go outside the record in rendering a decision.").

Interrogation").  Lt. Wirsing then prepared an Internal Investigation Report detailing the course of the investigation and stating that Plaintiff's "actions on March 20th and in my opinion his lack of truthfulness during his interrogation warrant discipline."  (R. 587).[2]

After Chief Byrne filed formal charges against Plaintiff with the Board on July 9, 2010, the Board held an evidentiary hearing on October 23, 2010 during which it heard sworn testimony from Plaintiff, who was represented by counsel, and eight other witnesses.  On December 2, 2010, the Board issued its "Findings and Decision" that Plaintiff was guilty of the charges and that he be discharged for cause for violating LPD Standards of Conduct.  The Board found that Plaintiff left the scene after he hit the fire hydrant, failed to report the incident, and made untrue statements during the police investigation in order to deceive the LPD regarding his knowledge of a property accident and his failure to report it.

Since Plaintiff takes issue with six factual findings of the Board that he says were against the manifest weight of the evidence, a detailed summary of the evidence follows.

**B.    The Incident and 911 Call**

On the afternoon of March 20, 2010, Michael Grieco was driving home on Roosevelt Road with his girlfriend, Jane Ponkonin. (R. 398-99).  The couple witnessed a silver Dodge Ram pickup truck "peel[] out" of a driveway, fishtail, jump the curb and hit a fire hydrant.  (R. 398-99, 425).  Mr. Grieco and Ms. Ponkonin both testified at the October 23, 2010 Board hearing that the hydrant turned from the impact and they saw something "fl[y] off the thing."  (R. 400, 406, 425-26, 430).  The male driver then pulled

---

[2]    The Court will cite to page numbers found in the administrative record, Doc. 27, as "(R. __)."

into another area, which Mr. Grieco called a "driveway" and Ms. Ponkonin called a "parking lot," got out and checked his car for damage, and drove off again. (R. 401-02, 426, 428). Mr. Grieco placed a call to 911 to report the incident, providing a license plate number for the truck and telling the dispatcher that after hitting the hydrant, the driver "got back out on the road and pulled off to see if his car was ok and then took off." (R. 535). In relaying this information to a second dispatcher, the first dispatcher said that the driver "got out looked at his truck since it was ok took off." (R. 536).

Plaintiff admitted during the May 2010 interrogation and at the October 2010 hearing that on March 20, 2010, he lost control of his silver Dodge Ram pickup truck in slippery conditions, fishtailed and jumped the curb while pulling out of a driveway on Roosevelt Road. (R. 476, 557). He also agreed that he immediately pulled over and "gathered [him]self" because he was "a little freaked out," but said he stopped for "[f]ive seconds tops," did not realize he had hit anything, and did not get out of his truck at that time. (R. 563, 567, 573).

### C. Events at the LPD Station and Investigation of the Incident

Mr. Grieco and Ms. Ponkonin followed Plaintiff as he drove away from the scene and saw that he drove his pickup truck to the LPD station. Mr. Grieco reported this to the 911 dispatcher. He also said that he and his companion would be willing to speak to an officer about the incident. (R. 535, 536). Plaintiff testified at the interrogation that he parked his truck in the police station lot, and when he exited the vehicle, he saw for the first time that there was a crease and red mark on his front passenger bumper. (R. 558, 565). Though he wondered "where did this come from," his only response at that time was to enter the station, attend roll call, spend 5 or 10 minutes doing

4

miscellaneous tasks, and get into his assigned patrol car for the day. (R. 558, 564). A timeline of video recordings prepared by Lt. Wirsing showed that Plaintiff was in the station for more than 45 minutes before he headed to the patrol car. (R. 555). Plaintiff conceded that he did not say anything about the accident during that period, explaining that he "didn't know anything happened." (R. 567). As he was leaving the station in his patrol car, however, he saw Sgt. Gabinski, the day shift watch commander, getting into a car near his truck. (R. 558).

Sgt. Gabinski had heard the radio dispatch of the 911 call complaining of a hit and run and testified that CSO Pam Lessner told her Plaintiff was involved. (R. 329-31). Sgt. Gabinski notified Sgt. Marks, the afternoon shift watch commander coming on duty, and they agreed that she would go photograph the scene of the incident while he spoke to Mr. Grieco and Ms. Ponkonin, who were sitting in the lobby. (R. 334, 375). At the October 2010 hearing before the Board, Sgt. Gabinski described the scene as "very slushy, very snowy, very wet and very cold" with "[h]eavy precipitation" in the form of slushy snow and sleet. (R. 336-37). She observed that "the entire fire hydrant had been turned approximately 25 degrees," (R. 338), and there was a tire mark "over the curb and arcing toward the fire hydrant and back down off the curb again." (R. 339). After photographing these observations, Sgt. Gabinski returned to LPD to check for damage on Plaintiff's vehicle. (R. 339, 343-44). She saw that the right front passenger side of his truck had a red paint transfer consistent with the color of the hydrant, there was damage to the bumper at a height consistent with the hydrant, and a lamp bezel was missing from the fog light inside the bumper. (R. 345-46). While Sgt. Gabinski was

photographing the damage, Plaintiff parked his patrol car, got out and approached her. (R. 346, 348).

Plaintiff testified that he told Sgt. Gabinski that he had lost control of his vehicle before work and was headed back to the scene to see what happened and report it. (R. 558). Sgt. Gabinski testified that Plaintiff told her he thought he had affirmatively hit something and wanted to go back and see what it was. (R. 348, 349). At Sgt. Gabinski's instruction, Plaintiff returned to the station and went to his supervisor's office. (R. 349, 559). He started telling Sgt. Marks what had occurred on Roosevelt Road, but the sergeant told him to wait for Sgt. Gabinski. (R. 377, 559). Sgt. Marks had already conducted a joint interview of Mr. Grieco and Ms. Ponkonin by that time.[3] (R. 376, 387).

Sgt. Gabinski completed her photographs and joined Plaintiff and Sgt. Marks in the office, at which time Plaintiff proceeded to give his account of the incident. (R. 350, 393-95, 559). Sgt. Gabinski testified that when she told Plaintiff there were civilian witnesses to the accident, he said that he "must have cut them off when I turned out of the parking lot." (R. 352). At the May 2010 interrogation, Plaintiff denied saying this, telling Lt. Wirsing and Lt. Watkins that he remembered only "one vehicle in the curb lane that was coming, and . . . it wasn't close." (R. 561). When Sgt. Gabinski asked Plaintiff whether he had notified his insurance company about the accident, he responded that he did not want to make a police report in the absence of any damage to the hydrant. (R. 350-51). There was conflicting testimony from Sgt. Gabinski and Sgt. Marks about whether during this discussion in the office, Sgt. Gabinski mentioned the hydrant or Plaintiff did so unprompted. (R. 351, 379). In any event, the parties agree that Sgt.

---

[3]     Mr. Grieco testified that he also went to look at Plaintiff's truck with another police officer and confirmed for her that the damage was "where [the driver] hit the fire hydrant on that side." (R. 404).

Marks typed up Plaintiff's statement while they were speaking, and Plaintiff reviewed it and confirmed that it was accurate. (R. 379, 559). At some point that afternoon, Sgt. Marks went to the accident scene himself and took measurements. (R. 380-81). He then created a diagram, (R. 551), showing that the hydrant was 4 feet 8 inches from the curb, (R. 382), and the tire track on the parkway was 28 feet 6 inches long. (R. 385).

Plaintiff testified at the Board hearing that this initial investigation took 4 to 4 1/2 hours because "they had to . . . contact commanders and higher-ups, so they were making a barrage of phone calls [and] would kinda send me out, and then they'd call me back in." (R. 559). Finally around 8:00pm or 8:30pm, Sgt. Gabinski issued Plaintiff tickets charging him with damage to Village property and failure to give aid or information after striking property (i.e., hit and run). (R. 389, 559). He accepted an offer to go home early rather than completing the rest of his shift. (R. 560).

The next day, on March 21, 2010, Sgt. Gabinski jointly interviewed Mr. Grieco and Ms. Ponkonin over the telephone. Her unofficial notes reflect that Ms. Ponkonin was 95 to 100 percent certain that Plaintiff had gotten out of the truck when he pulled into a "first driveway" after hitting the hydrant, and Mr. Grieco was 85 to 90 percent certain. (R. 355, 362-63, 547, 549). The notes also indicate that the witnesses believed Plaintiff had been wearing blue jeans, and Ms. Ponkonin thought "maybe" he had on a striped shirt. In fact, Plaintiff was in uniform, including navy blue pants. (R. 547, 549).

On March 22, 2010, Lieutenant John Lavery reviewed photographs of the accident scene and Plaintiff's truck. (R. 419). He noticed in the pictures that the truck's bezel surrounding the fog lamp was missing so he went to the scene to see if he could find it. (R. 420). Lt. Lavery testified that he found a bezel with a Dodge symbol on it in

the grass near the incident, and there was a bit of red on it similar to the color of the hydrant. (R. 420-22). He assigned Officer Angela Lawson, an LPD evidence technician, to photograph the bezel at the scene. (R. 437-38). Sometime thereafter, Village maintenance worker Eric Lindgren received a call to fix a fire hydrant on Roosevelt Road. (R. 465-66). He testified at the October 2010 hearing that the hydrant "had been spun," a movement that required "significant" force. (R. 467, 469). It took Mr. Lindgren and his partner approximately two hours to complete their repairs. (R. 471).

### D.    Internal Investigation

On March 24, 2010, Chief Byrne assigned Lt. Wirsing to conduct a formal internal investigation into the events. Lt. Wirsing prepared an Internal Investigation Report[4] of his findings, which reflects that he conducted the following interviews: (1) on March 25, 2010, he interviewed Sgt. Gabinski (R. 459, 577-79); (2) on April 1, 2010, he interviewed Mr. Grieco and Ms. Ponkonin jointly at their apartment (R. 580-82), and then interviewed Sgt. Marks (R. 460, 582-84); (3) on April 5, 2010, he interviewed CSO Lessner (R. 584-85); and (4) on June 3, 2010 he re-interviewed Mr. Grieco and Ms. Ponkonin jointly at their apartment.[5] (R. 588). The substance of these interviews

---

[4]    The Board argues, without citation to any authority, that Lt. Wirsing's report is not properly before this Court because it "was never introduced as evidence in the hearing" but only "referred to" by Plaintiff's counsel and "identified as an exhibit." (Doc. 204, at 5). Given that the Board prepared the official administrative record in this case, and the record includes Lt. Wirsing's report, (R. 577-90), the Court will consider it on review. *See Biscan v. Village of Melrose Park Bd. of Fire & Police Comm'rs*, 277 Ill. App. 3d 844, 847, 661 N.E.2d 424, 427 (1st Dist. 1996) ("The sole duty of the trial court in an administrative review action is to review *the administrative record* to determine whether the agency's decision is against the manifest weight of the evidence.") (emphasis added).

[5]    Lt. Wirsing brought along a "map of the roadway" to this meeting and had Mr. Grieco mark his specific locations relative to Plaintiff on the day in question, but the copy in the record is largely illegible. (R. 588-90). Lt. Wirsing also spoke with Mr. Grieco and Ms. Ponkonin several times on the phone regarding their availability to meet with him. (R. 457). As Mr.

largely conformed with the witnesses' testimony as set forth earlier. On May 10, 2010, Lt. Wirsing and Lt. Watkins conducted a formal interrogation of Plaintiff, which was recorded and transcribed. (R. 556-76, 586). Based on all of this evidence, Lt. Wirsing believed that Plaintiff had violated several LPD General Orders, and he therefore recommended that Plaintiff receive appropriate discipline as determined by Chief Byrne or the Board. (R. 586-87).

### E. The Administrative Hearing and Decision of the Board

Based at least in part on Lt. Wirsing's report, Chief Byrne filed formal charges against Plaintiff with the Board on July 9, 2010. The Board held an evidentiary hearing on October 23, 2010, and issued its "Findings and Decision" shortly thereafter on December 2, 2010. The Board assessed the demeanor and responses of each witness and found that Plaintiff's statements were not credible, and the testimony of Mr. Grieco, Ms. Ponkonin, Sgt. Gabinski, Sgt. Marks, Lt. Lavery, Officer Lawson, Lt. Wirsing and Mr. Lindgren *was* credible. (R. 2 ¶ 11; R. 5 ¶ 15). The Board made the following specific factual findings:

● Mr. Grieco and Ms. Ponkonin, two independent witnesses with no motive to lie, each gave credible testimony that they saw the driver of the pickup truck "temporarily lose control of his vehicle and strike the fire hydrant." They further testified that after striking the hydrant, "the driver immediately proceeded to drive into the parking lot of a bank located a short distance from the accident scene, exited his vehicle and checked the vehicle for damage." The witnesses then saw the driver "leave the scene of the accident and they called 911 to report a hit and run accident, providing a description of the vehicle and license plate number. While speaking to the 911 dispatcher, they followed the vehicle into a parking lot of the Lombard Police Station." (R. 2 ¶¶ 13a, c).

---

Grieco explained, the lieutenant was "trying to make sure that the story was straight" and "was keeping us updated with everything to make sure, you know, just to let us know if you're going to appear you need to come at this date and at this time." (R. 415).

●      On the tape recording of the 911 call, Mr. Grieco is "heard indicating to the radio operator he was observing the individual exit the vehicle and check the front of the vehicle for damage."  (*Id.* ¶ 13b).

●      Sgt. Gabinski testified that she received the report of a hit and run and went to the scene to take photographs.  She observed a fire hydrant that had been struck with such force that the hydrant was turned on its axis.  She proceeded to the police parking lot to check Plaintiff's silver vehicle, and saw that it "had damage to the right front passenger side" and some red paint in that location.  Sgt. Gabinski testified that Plaintiff drove up to her location in his patrol car, and told her that he "thought he hit something and wanted to go back and see what it was."  (*Id.* ¶¶ 13d, f; R. 3 ¶ 13h).

●      Plaintiff "knew that he had hit the fire hydrant prior to driving to the police station.  The [video surveillance] timeline that was introduced into evidence clearly shows that almost forty-five minutes transpired from the time [Plaintiff] entered the police station until the time that he left the station to go on duty.  At no time did [Plaintiff] report the accident to any police authority.  It was not until he saw Sergeant Gabinski taking photographs of his vehicle that he . . . made any statement regarding possibly hitting something."  (R. 3-4 ¶ 13o).

●      Plaintiff made untruthful statements to Lt. Wirsing and Lt. Watkins during his tape-recorded interrogation.  While he admitted "losing control of his vehicle and going up onto the curbway" and "pull[ing] into the bank parking lot thereafter," Plaintiff "repeatedly denied exiting his vehicle and looking at the damage to his vehicle in the bank parking lot" and "made repeated statements that he first checked his vehicle for damage in the police parking lot."  He also said he did not know he hit anything and spent only 5 to 10 minutes in the police station after roll call, "however the timeline establishes that he was in the station for almost 45 minutes."  (R. 4 ¶¶ 13p, q, r).

●      Plaintiff made untruthful statements to Sgt. Marks and Sgt. Gabinski when they spoke with him about the incident, telling Sgt. Marks that he "did not know that he had hit anything," and advising Sgt. Gabinski that he "did not know what he had hit" and "first checked his vehicle for damage in the police department parking lot."  (*Id.* ¶¶ 13s, t).

●      The untruthful statements "were made by [Plaintiff] in an attempt to justify his failure to report the accident as required by law," and were "designed to deceive officers of the [LPD] regarding his knowledge of a property damage accident March 20, 2010 and his failure to report the accident."  (*Id.* ¶¶ 13v, w).

●      Plaintiff's conduct "constituted a violation of General Order No. 26.4, Standards of Conduct, of the Police Department of the Village of Lombard: Section 26.4.1 A.1, Obedience to Laws, Section 26.4.2 C., Attention to Duty, Conduct and Behavior, Section 26.4.2 F., Attention to Duty, Truthfulness, Section 26.4.2 G., Attention to Duty, Officers always subject to Duty, Section 26.4.6 B., Maintenance of Property,

Responsible for Village Property, and Section 26.4.6 G., Maintenance of Property, Reporting Accidents." (R. 5 ¶¶ 14b, d).

In determining an appropriate punishment, the Board considered evidence and arguments in aggravation and mitigation that were presented at a hearing on November 23, 2010. (R. 5 ¶ 16). The Board first found that Plaintiff had "received no commendations as a police officer." (*Id.* ¶ 17a). The Board also concluded that his "performance evaluations exhibited inconsistent performance" that did "not mitigate the discipline to be imposed." As the Board explained, Plaintiff had

> received comments from his supervisors regarding his performance including: having a lack of focus, being more attentive to his duties, being more punctual, needing to re-focus his efforts to being committed to the basics of his job assignment, being more vigilant with unattended prisoners, being more attentive in writing reports and the quality of his work product, lack of communication with his supervisors, and improvement in organizational skills.

(R. 5-6 ¶¶ 17b, 18; R. 652-83). Relying on an uncontested affidavit from Robert Berlin, Chief of the Criminal Division of the DuPage County State's Attorney's Office, the Board found that Plaintiff's untruthfulness "will be required to be disclosed in each criminal prosecution in which [Plaintiff] would be involved and in each instance will bring the [LPD] into disrepute and could further result in the impeachment of [Plaintiff] as a witness and have a significant effect upon all arrests made by [him]." (R. 6 ¶ 19; R. 610-12, 618-19). Finally, the Board concluded that Plaintiff's "false statements . . . relate directly to his duties as a police officer," and that his conduct "affects police morale and undermines public confidence in the police department." (R. 6 ¶¶ 20, 22). As a result of these findings, the Board ordered that Plaintiff be discharged from the LPD for cause. (*Id.* ¶ 23).

**<u>DISCUSSION</u>**

**A.     Standard of Review**

This Court has authority to review the Board's decision pursuant to an exercise of supplemental jurisdiction under 28 U.S.C. § 1367.  *See Harder v. Village of Forest Park*, No. 05 C 5800, 2008 WL 4561631, at *2 (N.D. Ill. May 2, 2008).  This review requires the Court to consider two issues:  (1) "whether the agency's finding of guilt is contrary to the manifest weight of the evidence"; and (2) whether the Board's "findings of fact supported its conclusion that cause existed for [Plaintiff's] discharge."  *Ehlers v. Jackson County Sheriff's Merit Comm'n*, 183 Ill.2d 83, 89, 697 N.E.2d 717, 720-21 (1998).

**B.     Analysis**

Plaintiff identifies six factual findings that he says were against the manifest weight of the evidence such that the Board's finding of guilt must be reversed.  He also claims that the Board's decision to discharge him was arbitrary, unreasonable and unrelated to the requirements of his service.  The Court considers each argument in turn.

**1.     Manifest Weight of Evidence**

In assessing whether the Board's determination of guilt is contrary to the manifest weight of the evidence, the Court must consider any factual findings as "*prima facie* true and correct*," Sheehan v. Board of Fire and Police Comm'rs of City of Des Plaines*, 158 Ill. App. 3d 275, 287, 509 N.E.2d 467, 475 (1st Dist. 1987), and cannot "reweigh the evidence or make an independent determination of the facts." *Abrahamson v. Illinois Dep't of Professional Regulation*, 153 Ill.2d 76, 88, 606 N.E.2d 1111, 1117 (1992).  The Board's decision will be against the manifest weight of the

evidence only if "all reasonable and unbiased persons, acting within the limits prescribed by the law and drawing all inferences in support of the finding, would agree that the finding is erroneous, and that the opposite conclusion is clearly evident." *Sheehan*, 158 Ill. App. 3d at 287, 509 N.E.2d at 476 (citing *O'Boyle v. Personnel Bd. of City of Chicago*, 119 Ill. App. 3d 648, 653-54, 456 N.E.2d 998, 1003 (1st Dist. 1983)). In other words, the mere fact that "an opposite conclusion might be reasonable or that the court might have reached a different conclusion is not adequate to set aside the agency's decision." *Id.* *See also Abrahamson*, 153 Ill.2d at 88, 606 N.E.2d at 1117 ("If the record contains evidence to support the agency's decision, it should be affirmed.").

As noted, Plaintiff insists that six of the Board's factual findings are based on "impossible stories," "serious inconsistencies" and "divergent testimony" that is so unreliable as to mandate the opposite conclusion in each case. The Court disagrees.

> **a. On the tape recording of the 911 call placed by Mr. Grieco and Ms. Ponkonin, "Michael []is heard indicating to the radio operator he was observing the individual exit the vehicle and check the front of the vehicle for damage."**

Plaintiff first challenges the Board's finding that Mr. Grieco told the 911 dispatcher that he saw Plaintiff get out of his truck after pulling into a driveway near the scene of the incident. The transcript of the 911 call reveals that Mr. Grieco said the driver "got back on the road and pulled off to see if his car was ok and then he took off." (R. 535). To Plaintiff's mind, there is no way this could reasonably be construed as a report that Mr. Grieco actually saw the driver exit the truck. (Doc. 191, at 10). In that regard, Plaintiff insists that "[t]here is no reason to believe that seeing if one's car was ok necessarily meant the driver had to exit the car." (Doc. 203, at 3). Of course, the 911 dispatcher clearly interpreted Mr. Grieco's statement to mean that the driver got out

of the vehicle, relaying to a second dispatcher that the driver "got out looked at his truck since it was ok took off." (R. 536). *See Sindermann v. Civil Serv. Comm'n of Village of Gurnee*, 275 Ill. App. 3d 917, 657 N.E.2d 41, (2d Dist. 1995) ("If there is anything in the record which fairly supports the agency's findings, the findings are not against the manifest weight of the evidence.").

Plaintiff responds that at the October 23, 2010 hearing, Mr. Grieco himself denied telling the 911 dispatcher the driver exited the truck. (Doc. 191, at 5). In fact, when asked whether he made such a statement, Mr. Grieco merely said "I don't think so," (R. 411), and then repeatedly confirmed that he personally saw the driver pull over, get out of his truck, and check for damage near the scene. (R. 401-03, 410, 412-13). Ms. Ponkonin corroborated this testimony. (R. 426, 428). On the record presented, the Court cannot say that it is "clearly evident" that Mr. Grieco said nothing to the 911 operator about Plaintiff getting out of his truck and checking for damage, much less that this somehow proves Plaintiff's next argument, discussed below, that he absolutely did not examine his truck at the scene. *Sheehan*, 158 Ill. App. 3d at 287, 509 N.E.2d at 476.

### b. Plaintiff "was observed getting out of his vehicle to inspect for damage immediately after striking the hydrant."

Putting aside the 911 call, Plaintiff argues that the Board had no basis for believing the testimony from Mr. Grieco and Ms. Ponkonin that they saw him exit his truck and check for damage after pulling off into a driveway. The record reflects that both witnesses repeated this testimony on multiple occasions, including: (1) to Sgt. Marks immediately following the accident on March 20, 2010; (2) to Sgt. Gabinski over the telephone on March 21, 2010; (3) to Lt. Wirsing during in-person interviews at their

home on April 1 and June 3, 2010; and (4) to the Board at the October 23, 2010 hearing. According to Plaintiff, however, the witnesses "make a barrage of inconsistent statements" that are so "convoluted" this testimony cannot be believed. (Doc. 191, at 11).

By way of example, Plaintiff first notes that Mr. Grieco and Ms. Ponkonin gave conflicting accounts of what the driver was wearing. Mr. Grieco told Sgt. Marks that he did not recall the clothing, (R. 366-67), but the next day he told Sgt. Gabinski the driver was wearing blue jeans. (R. 549). Ms. Ponkonin told Sgt. Gabinski the driver was wearing blue jeans and "maybe" a striped polo shirt, but testified at the October 2010 hearing that she "could be mistaken" about the striped shirt. (R. 431-32, 547). In fact, there is no dispute that Plaintiff was in uniform, including navy blue pants.

Plaintiff also claims the witnesses gave inconsistent testimony about where they were when they saw him exit his truck. Sgt. Gabinski's unofficial notes indicate that Mr. Grieco and Ms. Ponkonin were in a "2nd drive" with a view of the passenger's side of the driver's truck, and Ms. Ponkonin saw the driver in her side view mirror. (R. 547). During the April 1, 2010 interview, Mr. Grieco told Lt. Wirsing that after the driver pulled into the Charter One Bank parking lot, they pulled into a Citibank parking lot. He and Ms. Ponkonin both confirmed that they "could see the driver exit his truck and walk to the front of the truck as if he was inspecting it." (R. 581). Mr. Grieco further stated that "by the time they parked, the pick up truck [sic] was beginning to pull back onto Roosevelt Road." (R. 581). When Lt. Wirsing interviewed Mr. Grieco again on June 3, 2010, he reiterated that he drove into the Citibank parking lot, then said that after seeing the driver get out and inspect the car, he and Ms. Ponkonin "proceeded to drive around

the back of the businesses . . . loosing site of the pick up truck [sic] for approximately 5 to 10 seconds." (R. 588).

At the October 2010 hearing, Mr. Grieco testified that after seeing Plaintiff hit the hydrant, he and Ms. Ponkonin pulled into a Citibank driveway "just to see if everything was okay," but it was "mainly [Ms. Ponkonin] looking because [Mr. Grieco] was focusing on the road, but [he] was still able to, you know, look through the rear view mirror." (R. 401-03). Ms. Ponkonin testified that she "observed [the driver] getting out of his vehicle. By this time we were passing by, but as we were passing by I saw him getting out of his vehicle and actually check what the damage was." (R. 426). She then had this exchange with Chief Byrne's counsel:

> Q: Okay. Where were you when you saw that male get out of the truck?
>
> A: We were still in the right side. We were turning into – we were rounding the corner because we got to that end of, I believe, Roosevelt I believe what it was.
>
> Q: Okay. You're turning into a parking lot area?
>
> A: Right. Turning around. And we actually started following it and that's when we called in.

(R. 427). On cross-examination, Ms. Ponkonin said she saw the driver exit the truck "from a rear view mirror because we were just passing by" and "turning around." (R. 429). She finally testified that they "turned into actually the mall parking lot which is connected to the [B]ank [O]ne and that's how we made the U-turn," including driving around a building. (R. 434-36).

In Plaintiff's view, none of this testimony makes sense. Did the witnesses see him pull into a "driveway" or was it a "parking lot"? Plaintiff insists that he never went into any "parking lot" but stopped "only 20 feet or so up the driveway, and only entered

16

the parking lot to take a U-turn." (Doc. 191, at 11). Were the witnesses "passing by," "parked," or "turning around" when they saw him get out of the truck? Did they themselves pull into the Citibank driveway on Roosevelt Road or go around the corner and enter from another street?[6] Adding to the confusion, Plaintiff says, are: (1) questions about the witnesses' ability to see clearly while looking through rear view mirrors on a cloudy day and traveling 35 mph; (2) his disbelief that Mr. Grieco, who said he had to move into the left lane to avoid hitting Plaintiff as he pulled out of the driveway, (R. 399-400), actually could have seen Plaintiff move the hydrant while he "traveled past [Plaintiff's] truck and past the fire hydrant, and had the driver's side of [Plaintiff's] truck directly in his sight line to the fire hydrant" blocking the view; and (3) his speculation that since the witness interviews were conducted jointly, the statements were "very possibly coached." (Doc. 191, at 11; Doc. 203, at 2). Plaintiff contrasts this "jumble of inconsistent testimony" with his stated belief that he himself provided "consistent answers" about how he did not get out of the truck until he arrived at the LPD station. (R. 191, at 2, 4; Doc. 203, at 3-4).

The Board disagrees that Mr. Grieco and Ms. Ponkonin actually testified inconsistently on all the cited points, noting for example that Ms. Ponkonin always expressed uncertainty about the striped shirt. (Doc. 198, at 10). In addition, the witnesses could have been both "passing by" and "turning around" when they saw Plaintiff exit his truck since they were in a moving vehicle. (*Id.* at 11). As for whether Plaintiff pulled into a driveway, bank driveway, mall driveway or parking lot, the Board

---

[6]     Plaintiff suggests that Ms. Ponkonin testified about how they drove "all the way to Main Street, took a right proceeding South on Main, then turned right into the Main Street entrance of the Citibank parking lot." (Doc. 191, at 11). The record, however, contains no testimony regarding "Main Street."

sees no meaningful distinction between any of these interchangeable terms.  (*Id.* at 11-12).

Regardless, Plaintiff's arguments essentially boil down to a request that the Court reverse the Board's credibility assessments and find him more believable than Mr. Grieco and Ms. Ponkonin.  This is improper, as "[i]t is the responsibility of the administrative agency to weigh the evidence, determine the credibility of witnesses and resolve conflicts in testimony."  *Collier v. Board of Review of Illinois Dep't of Employment Sec.*, 2013 IL App (1st) 120749-U, ¶ 12 (Jan. 31, 2013).  As one court has explained, it is not the purpose of an administrative review to "resolve factual inconsistencies, nor to re-weigh the evidence to determine where the preponderance of the evidence lies."  *Thigpen v. Retirement Bd. of Firemen's Annuity and Benefit Fund of Chicago*, 317 Ill. App. 3d 1010, 1017, 741 N.E.2d 276, 281 (1st Dist. 2000).

Mr. Grieco and Ms. Ponkonin both repeatedly confirmed that they saw the driver exit his truck at the scene.  Plaintiff's belief that the witnesses "were simply mistaken" on this point, (Doc. 191, at 11), is insufficient to establish that the testimony is so obviously unreliable that the Board should have found the exact opposite to be true.  *Sheehan*, 158 Ill. App. 3d at 287, 509 N.E.2d at 476.  Indeed, Plaintiff does not cite any competent evidence suggesting that Mr. Grieco and Ms. Ponkonin were somehow "coached" in this case.  Plaintiff did not make any such argument to the Board, nor does he challenge the Board's finding that neither witness had "any motive to testify falsely."  (R. 2 ¶ 13c).

Equally unavailing is Plaintiff's objection that the Board "failed to produce the original of a key piece of evidence used by the Chief's investigating officer when interviewing the witnesses."  (Doc. 203, at 3).  The evidence in question is the "map of

the roadway," on which Lt. Wirsing had Mr. Grieco mark his specific locations relative to the truck driver (Plaintiff) during the June 2010 interview. (*Id.*; R. 589-90). Plaintiff faults the Board for producing a largely illegible copy as part of the administrative record, claiming that "the Board offered no explanation as to where the original is, nor did it identify any steps it took to locate it." (Doc. 203, at 4).

As a preliminary matter, the map was never marked as a separate exhibit at the October 2010 hearing but was attached to Lt. Wirsing's Internal Investigation Report. Though Plaintiff's counsel identified the entire report as Exhibit 12, she never mentioned the map or questioned Lt. Wirsing about it. Plaintiff's assertion that this was somehow a "key piece of evidence" thus rings quite hollow. (Doc. 203, at 3). In addition, the Court has no reason to doubt the Board's representation that the map attached to the administrative record is of the same quality as the map produced by Plaintiff's counsel at the hearing, and that the Board does not have any other version in its possession or control. (Doc. 204, at 5-6). Plaintiff fails to cite any case law suggesting that the Board was required to produce anything more than this. Nor does he provide any explanation as to how a more legible copy of the map would establish that Mr. Grieco and/or Ms. Ponkonin gave such unreliable testimony that it cannot be believed.

In sum, notwithstanding the illegible nature of the "map of the roadway," viewing the record as a whole, the Court is satisfied that the Board's decision to credit testimony from Mr. Grieco and Ms. Ponkonin that Plaintiff exited his truck at the scene is not against the manifest weight of the evidence.

**c.** **Plaintiff made untruthful statements to Sgt. Gabinski and Sgt. Marks, which he repeated during the May 10, 2010 interrogation.**

In a related argument, Plaintiff challenges the Board's finding that he made untruthful statements to Sgt. Gabinski and Sgt. Marks on March 20, 2010, and then to Lt. Wirsing and Lt. Watkins during the May 10, 2010 interrogation. The untruthful statements included: (1) repeatedly denying that he exited his vehicle and checked for damage in the bank parking lot; (2) repeatedly stating that he first checked his truck for damage in the police parking lot; and (3) stating that he did not report the accident because he did not know that he had hit anything. (R. 4 ¶¶ 13q, s). Plaintiff once again insists that he never got out of his truck prior to parking at the LPD station, and says "the only evidence that he did this is the mistaken statements from the witnesses." (Doc. 191, at 12). For the reasons stated in the previous section, the Board's decision to credit statements from Mr. Grieco and Ms. Ponkonin while finding Plaintiff's contrary statements untruthful is not against the manifest weight of the evidence.

**d.** **Plaintiff's "untruthful statements were made . . . in an attempt to justify his failure to report the accident as required by law," and "were designed to deceive officers of the Lombard Police Department regarding his knowledge of a property damage accident March 20, 2010 and his failure to report the accident."**

Plaintiff next argues that his untruthful statements were in no way designed to deceive LPD officers or justify his failure to report the accident. As Plaintiff sees it, he "told Sgt. Gabinski within a short time after the incident, that he was involved in it, may have hit something, and wanted to go back to the scene to piece it together. He thereafter fully and respectfully cooperated with the LPD investigation, and . . . never denied the possibility that his truck made contact with the hydrant." (Doc. 191, at 12).

Once again, Plaintiff is asking the Court to delve into the credibility of his own testimony, which is an area reserved for the Board. *Collier*, 2013 IL App (1st) 120749-U, ¶ 12; *Thigpen*, 317 Ill. App. 3d at 1017, 741 N.E.2d at 281.

Moreover, Plaintiff admitted that after seeing the damage to his truck, he said nothing about the incident "to any supervisor either before or during roll-call." (R. 4 ¶ 13u). Plaintiff may believe that this amounted to "a short time," but the video timeline shows that more than 45 minutes elapsed while he was in the station. (R. 555). During that period, he walked back and forth between the roll call room and the front desk but did not indicate to anyone that he had been in an accident of any kind. (*Id.*). In fact, "[i]t was not until [Plaintiff] saw Sergeant Gabinski taking photographs of his vehicle that he . . . made any statement regarding [the] possibility of hitting something." (R. 3-4 ¶ 13o). This record fairly supports the Board's view that Plaintiff purposely and knowingly avoided reporting the accident until he essentially had no choice, and lied to cover his tracks.

Plaintiff disagrees, claiming that even though he knew he had swerved off the road and could see damage to his truck, he "was put in the very undesirable and stressful position of being asked to admit to something he simply did not know for certain was true." (Doc. 191, at 13). Given the uncontroverted testimony that the hydrant rotated 25 degrees, which required "significant" force, it is not "clearly evident" that Plaintiff's testimony on this issue was credible. *Sheehan*, 158 Ill. App. 3d at 287, 509 N.E.2d at 476. The Board's determination that Plaintiff made untruthful statements to justify his failure to report the incident on March 20, 2010 and in an effort to deceive the LPD is not against the manifest weight of the evidence.

### e. Plaintiff "received no commendations as a police officer."

During the aggravation/mitigation phase of the proceedings on November 23, 2010, Plaintiff's counsel introduced some 29 documents[7] she characterized as "letters of commendation" from her client's personnel file.  (R. 619).  In one such letter, the Patrol Division Commander of the Wheaton Police Department wrote to Chief Byrne expressing "personal thanks . . . for the prompt and professional assistance provided by Officer Bradford" in responding to a request for canine assistance.[8]  (Doc. 687).  In another letter, the Chief of Police of the City of Elmhurst wrote to "commend" Plaintiff and his K-9 partner for assistance with a residential burglary.  (R. 690).  In still another letter, the principal of Willowbrook High School wrote a letter to Plaintiff thanking him for "your commitment in helping keep our school drug free through our 'Canine Searches.'" (R. 701).  Finally, a fourth letter addressed to Chief Byrne from the President of Express Personnel Services stated that Plaintiff "handled himself in a very professional manner that represents the Lombard Police Department extremely well," and thanked him for "the outstanding job he did" investigating a complaint of forged timecards.  (R. 706).

The Board held that none of the letters amounted to a commendation sufficient to mitigate Plaintiff's discipline.  (R. 5 ¶ 17a).  The Board did not elaborate on this point in its decision, but explains in response to Plaintiff's motion that these were all letters of appreciation as opposed to official commendations.  (Doc. 198, at 14).  Consistent with that position, none of Plaintiff's performance evaluations refers to any commendations, though some do confirm that he received letters of "thanks" or "appreciation."  (Doc. 204, at 7; R. 652-83).  Plaintiff objects that the Board's decision made no distinction

---

[7]     Plaintiff claims there are 31 letters, but one appears in the record twice, (R. 708, 713), and one does not relate to Plaintiff.  (R. 712).

[8]     It appears that Plaintiff was a canine officer for some period of time.

regarding official versus unofficial commendations, finding only that he received "no commendations as a police officer" at all, as opposed to no "official" commendations or mere letters of appreciation. (Doc. 203, at 5; R. 5 ¶ 17a).

Neither party provides any case law or other authority indicating what constitutes a "commendation" in the law enforcement context generally, or for purposes of mitigation specifically. As a result, the Court cannot say that "all reasonable and unbiased persons, acting within the limits prescribed by the law and drawing all inferences in support of the finding, would agree that" the letters are in fact commendations. *Sheehan*, 158 Ill. App. 3d at 287, 509 N.E.2d at 476. It might be reasonable to characterize the letters as such, but since it is also reasonable to view them as appreciative thank-you notes, and the Board did consider the substance of the letters before imposing discipline, there is no adequate basis to set aside the agency's decision. *Id.*

> ### f. Plaintiff's "performance evaluations exhibited inconsistent performance" and "do not mitigate the discipline to be imposed."

Plaintiff finally claims that his performance evaluations were in no way inconsistent as stated by the Board and instead "show that he consistently met or exceeded LPD's performance expectations." (Doc. 191, at 13). Plaintiff does not dispute the Board's finding that the following criticisms appear within his reviews:

> received comments from his supervisors regarding his performance including: having a lack of focus, being more attentive to his duties, being more punctual, needing to re-focus his efforts to being committed to the basics of his job assignment, being more vigilant with unattended prisoners, being more attentive in writing reports and the quality of his work product, lack of communication with his supervisors, and improvement in organizational skills.

(R. 5-6 ¶¶ 17b, 18; R. 652-83).  Rather, Plaintiff stresses that there is no record of any past discipline, (*id.*), and objects that the Board "myopically cherry-picked [his] performance reviews to find only specific excerpts of [his] performance evaluations that cited flaws."  (Doc. 203, at 6).  For example, the Board said nothing about reviews showing that he had done an "outstanding job" in certain areas on four occasions, (R. 664, 674, 677, 680), and exhibited a "positive work ethic" on one occasion.  (R. 664).  Similarly, the Board "failed to recognize that [Plaintiff] accomplished every single objective he was held to in these evaluations."  (Doc. 203, at 6) (citing R. 655, 658, 662, 665, 669, 672, 675, 678, 681).

Though the Board did not mention these specific achievements, neither did it point out that Plaintiff was involved in a "chargeable traffic crash" in 2005, (R. 671), and a "single vehicle property damage crash which was classified as a 'chargeable' property damage accident" in 2009.  (R. 657).  There is no dispute that while Plaintiff generally met the requirements of his position (and twice exceeded them), his reviews contain numerous criticisms covering various aspects of his performance, including lack of focus, problems with the quality of his written reports, lack of communication with supervisors and organizational deficiencies.  Plaintiff may have a more positive perception of himself as a police officer, but he did not call any reputation witnesses to bolster his case and was charged with a serious offense of deliberately deceiving his superiors about damage to Village property.  The mitigation cases he cites are thus easily distinguishable.  *Cf. Kreiser v. Police Bd. of City of Chicago*, 40 Ill. App. 3d 436, 440, 441, 352 N.E.2d 389, 393, 394 (1st Dist. 1976) (police officer's false report to a superior that he had not driven his personal vehicle while it was unlicensed was "only

peripherally related to plaintiff's official police duties" and, "especially in light of testimony by a number of reputation witnesses as to his satisfactory service record," did not support a penalty of discharge); *Huff v. Rock Island County Sheriff's Merit Comm'n*, 294 Ill. App. 3d 477, 484, 689 N.E.2d 1159, 1165 (3d Dist. 1998) (police officer's "inability to complete ministerial tasks" was "not of such a grievous nature as to reasonably allow for his termination" where his record contained "numerous letters of appreciation.").

Plaintiff's performance reviews are not so glowing that they clearly mitigate the imposed discipline, and the Board's finding in that regard is not against the manifest weight of the evidence. *Sheehan*, 158 Ill. App. 3d at 287, 509 N.E.2d at 476.

## 2. Cause for Discharge

Plaintiff argues that regardless of these factual findings, the Board did not have cause to discharge him. Under this second step of the analysis, an agency has "cause" to discharge someone where he has "some substantial shortcoming which renders continuance in his office or employment in some way detrimental to the discipline and efficiency of the service and something which the law and a sound public opinion recognize as a good cause for his no[] longer occupying the place." *Ehlers*, 183 Ill.2d at 89, 697 N.E.2d at 721 (quoting *Fantozzi v. Board of Fire and Police Comm'rs of Village of Villa Park*, 27 Ill. 2d 356, 360, 189 N.E.2d 275, 277 (1963)). As the Illinois Supreme Court has explained:

> The question . . . is not whether this court would decide upon a more lenient sanction than discharge were it to determine initially what discipline would be appropriate. Nor is it whether this court would conclude in view of the mitigating circumstances suggested by [the plaintiff] that a different penalty would be more appropriate. The question is whether, in view of the circumstances presented, this court can say that the Civil Service

Commission, in opting for discharge, acted unreasonably or arbitrarily or selected a type of discipline unrelated to the needs of the service.

*Sutton v. Civil Serv. Comm'n*, 91 Ill.2d 404, 411, 438 N.E.2d 147, 150-51 (1982). The Board has "considerable latitude and discretion in determining what constitutes cause for discharge," and this Court "is required to give the Board's determination of cause for terminating an officer considerable deference." *Sangirardi v. Village of Stickney*, 342 Ill. App. 3d 1, 17, 18, 793 N.E.2d 787, 800, 801 (1st Dist. 2003).

### a. Lying to a Superior

Plaintiff argues that even though he damaged a public fire hydrant and then repeatedly lied about it to his superiors, this misconduct did not warrant the severe sanction of discharge. There are cases going both ways on the issue of lying, but "[t]he key factor is the subject matter of the falsehood, more specifically, how it directly relates to a policeman's duties to the public." *Kupkowski v. Board of Fire and Police Comm'rs of Village of Downers Grove*, 71 Ill. App. 3d 316, 324, 389 N.E.2d 219, 225 (2d Dist. 1979). Plaintiff directs the Court to several cases he finds analogous to his own, where officers lied about personal matters following some minor misconduct and were reinstated following discharge.

In *Kreiser v. Police Bd. of City of Chicago*, for example, a police officer was found to have committed four rule violations: (1) he failed to have his personal vehicle properly licensed; (2) he failed to promptly submit a report explaining why he had neglected to sign out when he left work for a related traffic court appearance; (3) he falsely told his lieutenant that he had not driven his personal vehicle while it was unlicensed; and (4) he left his duty assignment to attend traffic court without being properly relieved. 40 Ill. App. 3d at 439-40, 352 N.E.2d at 392-93. The Illinois Appellate

Court held that these violations were not sufficient to warrant the officer's discharge, explaining that they were not "so significantly related to the performance of [his] police duties as to demand the maximum penalty." *Id.* at 441-42, 352 N.E.2d at 394.

In *Humbles v. Board of Fire and Police Comm'rs of City of Wheaton*, 53 Ill. App. 3d 731, 368 N.E.2d 1049 (2d Dist. 1977), similarly, the police officer falsely told his sergeant that he was going to court to testify in a traffic case when, in fact, he was appearing for a personal matter relating to his divorce. He also disobeyed the sergeant's order to wait for him so they could drive to the courthouse together. *Id.* at 733, 368 N.E.2d at 1050. The Illinois Appellate Court found that while such deception and disobedience constituted misconduct, it was not enough to justify termination. In the court's view, there was "no indication that [the officer's] action had the effect of lowering police morale or undermining public confidence in the Wheaton Police Department." *Id.* at 734, 368 N.E.2d at 1051.

A third case, *Christenson v. Board of Fire and Police Comm'rs of City of Oak Forest*, 83 Ill. App. 3d 472, 404 N.E.2d 339 (1st Dist. 1980), involved a police captain who left the station in a squad car while on duty, explaining that he needed to see an eye doctor. In reality, the captain picked up his family and drove to a race track to care for his horses, which had been badly injured in an apparent chemical attack. *Id.* at 475, 404 N.E.2d at 341. Two other officers saw him out on the road and reported the incident to the chief, leading to an internal investigation. In response to written questions, the captain lied about why his family was with him in the car, but he subsequently told the truth during a polygraph test, "renounce[ing] . . . his earlier subterfuge." *Id.* at 475-76, 478, 404 N.E.2d at 341, 343.

The Illinois Appellate Court reversed the captain's termination, noting that he had been "confronted with what he believed to be a critical emergency situation concerning criminal damage to his valuable horses." The court found it significant that the captain had put another officer in charge and attempted to stay in radio contact, and stressed that he had "served the Department for 23 years and as a Captain for 9 years without previous discipline infractions." *Id*. at 476-77, 404 N.E.2d at 342. As for the lying, the court found that it did not justify the severe sanction of discharge because as in *Kreiser* and *Humbles*, the lie was "about attending to personal business while on duty." *Id*. at 478, 404 N.E.2d at 343. *See also Styck v. Iroquois County Sheriff's Merit Comm'n*, 253 Ill. App. 3d 430, 436, 438-39, 625 N.E.2d 390, 394, 396 (3d Dist. 1993) (discharge inappropriate where off-duty officer lied about statements he made to another officer when he was stopped for speeding in his personal vehicle, including falsely denying he told the officer he had been drinking and had fought with his wife; those statements "were in no way related to the plaintiff's duties to the public, and were so trivial that it would be unreasonable and arbitrary for the Commission to find they were cause for discharge.").

The Court does not find these cases dispositive of Plaintiff's situation. Unlike the officers in *Kreiser*, *Humbles*, *Christenson*, and *Styck*, who all lied about private matters (the licensing status of a personal vehicle, a divorce hearing, a personal emergency, a personal traffic stop), Plaintiff lied about damaging public property during a police investigation and again during a formal internal investigation while under oath, and failed to report the accident at the scene as required by law. These facts also distinguish the other two cases Plaintiff cites involving officers who were intoxicated

while off-duty but did not lie.  In *Kirsch v. Rochford*, 55 Ill. App. 3d 1042, 371 N.E.2d 899 (1st Dist. 1977), for example, an off-duty officer was drunk and belligerent at the airport, resulting in his being taken to the police station where he refused a direct order to take a Breathalyzer test.  *Id.* at 1043-44, 371 N.E.2d at 901.  Relying on *Kreiser*, the Illinois Appellate Court held that the officer should not have been discharged for this misconduct.  As the court explained, "except as to the taking of the alcoholic tests, [the officer] cooperated and submitted obediently although somewhat belligerently."  *Id.* at 1046, 371 N.E.2d at 903.  In addition, he "was not on duty at the time of the incident, had been a member of the police department for a number of years, and no material in aggravation was introduced into the record."  *Id.  See also Massingale v. Police Bd. of City of Chicago*, 140 Ill. App. 3d 378, 382, 488 N.E.2d 1289, 1292 (1st Dist. 1986) (discharge too severe a sanction for an off-duty police officer charged with drunk driving).  This case is also distinguishable because, as discussed below, the Board had uncontroverted affidavit testimony from Assistant State's Attorney Berlin that prosecutors would be required to disclose the Board's finding of Plaintiff's untruthfulness to criminal defendants in cases in which Plaintiff was to testify.  (R. 611 ¶ 10).  It does not appear that similar evidence was presented in the cases cited by Plaintiff.

The Board maintains that *Kupkowski v. Board of Fire & Police Comm'rs*, is more directly on point.  In *Kupkowski*, an on-duty officer drove his squad car into a retaining wall causing extensive damage to both, and then lied about it.  71 Ill. App. 3d at 318, 389 N.E.2d at 221.  The court acknowledged the decisions in *Kreiser* and *Humbles*, but explained that those officers did not deserve to be fired because they merely lied about attending to personal business while on duty, which "did not relate directly to the[ir]

public duties." *Id.*, 389 N.E.2d at 225-26. Officer Kupkowski, on the other hand, was properly discharged because his lie was "directly connected to an officer's duty to the public." Specifically, "[a]n officer on duty in a squad car has a duty to obey the laws and to avoid negligently damaging either public or private property and a lie relating to these duties is . . . grounds for dismissal." *Id.* at 324-25, 389 N.E.2d at 226.

Plaintiff attempts to distinguish this case by noting that he was off-duty and driving a personal truck at the time of the accident. (Doc. 203, at 7-8). As Plaintiff sees it, "Officer Kupkowski was far more culpable" because he caused "extensive damage [to] a police squad car" whereas Plaintiff caused "very minor damage to a fire hydrant." (*Id.* at 8-9). To be sure, Officer Kupkowski's misconduct may have been *worse* than Plaintiff's, but that in no way demonstrates that Plaintiff's misconduct was insufficient to merit discharge, especially since both officers lied about damaging public property, and Plaintiff did so during a formal investigation under oath. *See Kleifield v. Lake County Sheriff ex rel. Curran*, No. 2-10-0198, 2011 WL 10109594 (Ill. App., 2d Dist. Mar. 28, 2011) (relying on *Kupkowski* to affirm discharge of off-duty police officer who drove her private vehicle into a mailbox and then lied about her drinking to fellow and superior officers investigating a "hit-and-run accident that resulted in property damage"; court explained that "[t]he investigation was directly connected to [the officer's] duty to the public, and [her] dishonesty hindered that investigation."). Even the *Massingale* case, cited by Plaintiff, acknowledged that "off-duty conduct of law enforcement officers is subject to reasonable regulations and can serve as a cause for discharge." 140 Ill. App. 3d at 382, 488 N.E.2d at 1292. Indeed, "as the guardians of our laws, police officers are expected to act with integrity, honesty, and trustworthiness." *Sindermann*, 275 Ill.

App. 3d at 928, 657 N.E.2d at 50.  *See also Rodriguez v. Weis*, 408 Ill. App. 3d 663,

671, 946 N.E.2d 501, 507 (1st Dist. 2011) (court upheld discharge where officer altered

her return-to-work status reports and lied about it, explaining that "[t]he essence of the

misconduct for which plaintiff was found guilty focuses directly upon her lack of

honesty.").

The Board held that Plaintiff's conduct in damaging public property, failing to

report the accident, and making untruthful statements in an attempt to cover it up

amounts to "a substantial shortcoming which renders [his] continuance in the office . . .

detrimental to the discipline and efficiency of the service," and "affects police morale

and undermines public confidence in the police department."  (R. 6 ¶¶ 21, 22).  This

finding is consistent with the notion that "[t]he failure of an officer to provide truthful

statements during a department investigation could impair the department's ability to

properly and fully investigate violations of departmental regulations.  Such a failure

could impugn the integrity of the investigation and the department and adversely affect

the department's ability to provide efficient service to the community."  *Valio v. Board of

Fire and Police Comm'rs of Village of Itasca*, 311 Ill. App. 3d 321, 331, 724 N.E.2d

1024, 1032 (2d Dist. 2000).

Plaintiff disagrees with what he characterizes as "the Board's speculation that

fellow officers would in some way not trust [him] should he be reinstated," stressing that

"[n]o officer testified as to any alleged distrust or even discomfort should [he] be

reinstated."  (Doc. 203, at 13).  Of course, neither did any officer testify that Plaintiff's

conduct would not in fact reduce morale.  Plaintiff makes much of Lt. Wirsing's

testimony that "[f]rom what [he] know[s] of [Plaintiff], yes" he would describe him as a

good officer. (R. 462). Yet this in no way demonstrates that keeping him on the police force despite his lies would have no detrimental effect on morale, much less that the Board's finding in that regard "is simply not realistic." (Doc. 203, at 13). The Court is satisfied that when the Board decided to discharge Plaintiff, it did not act "unreasonably or arbitrarily," nor did it "select[] a type of discipline unrelated to the needs of the service." *Sutton*, 91 Ill.2d at 411, 438 N.E.2d at 151.

### b. Use of Dishonesty Findings to Impeach Plaintiff's Testimony in Court

Trying another approach, Plaintiff contends that there is no evidence that his lie would have any impact on his testimony in criminal cases. This argument stems from the Board's finding that Plaintiff's untruthfulness "will be required to be disclosed in each criminal prosecution in which Officer Bradford would be involved and in each instance will bring the Lombard Police Department into disrepute and could further result in the impeachment of Officer Bradford as a witness and have a significant effect upon all arrests made by [him]." (R. 6 ¶ 19). Case law supports the Board's assessment in this regard. *See, e.g., Rodriguez*, 408 Ill. App. 3d at 671, 946 N.E.2d at 507 ("A police officer's credibility is inevitably an issue in the prosecution of crimes and in the . . . police department's defense of civil lawsuits. A public finding that an officer had lied on previous occasions is detrimental to the officer's credibility as a witness and as such may be a serious liability to the department.").

Plaintiff nevertheless objects that "[w]hether and to what extent [his disciplinary record] would ever be seen or heard by a jury in any case in which [he] is a witness depends on a multitude of factors that would require an in depth analysis of the facts of an actual criminal case." (Doc. 203, at 9). Since the Board "did not have such facts

before it," he says, it "could not perform the necessary analysis." (*Id.*). The problem for Plaintiff is that the Board reached its conclusion in reliance on an uncontroverted affidavit from ASA Berlin, who said that pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), prosecutors would be required to disclose to criminal defendants the Board's finding that Plaintiff was "untruthful in responding to questions during a formal interrogation involving [his] admission of the criminal offense of leaving the scene of a property damage accident." (R. 611 ¶ 10). Plaintiff's counsel stipulated to the admission of the affidavit into evidence[9] and waived the right to cross-examine ASA Berlin regarding the statements found in it. (R. 6 ¶ 19; R. 618). Moreover, Plaintiff failed to present the Board with any contrary evidence on this issue. As a result, he cannot now object that the affidavit was somehow "speculative and incomplete," or that the Board's reliance on statements contained in it was against the manifest weight of the evidence. (Doc. 203, at 9). *See Lehmann v. Department of Children and Family Servs.*, 342 Ill. App. 3d 1069, 1078, 796 N.E.2d 1165, 1172 (1st Dist. 2003) (citing *Texaco-Cities Serv. Pipeline Co. v. McGaw*, 182 Ill.2d 262, 278 695 N.E.2d 481, 489 (1998)) ("Issues not placed before the administrative agency will not be considered for the first time on administrative review.").

Nor may Plaintiff argue that "the LPD has a fair number [of] current police officers who have sustained allegations of misconduct on the job that is as serious, and in some cases, far more serious than the off duty, minor vehicle accident and any investigation dishonesty involved here." (Doc. 203, at 10). Plaintiff may believe that "police officers with checkered disciplinary histories . . . testify in court in support of the prosecution's

---

[9] Contrary to Plaintiff's assertion, the affidavit is found within the administrative record at R. 610-12. There is thus no merit to his claim that "the Board relied on argument and not evidence to terminate [his] employment." (Doc. 203, at 11).

case every day," and that since ASA Berlin is able to present these officers "in the best light possible," he could do the same for Plaintiff if he took the stand. (Doc. 203, at 10, 11). However, none of this evidence of other officers' alleged misconduct was before the Board, and it thus cannot be considered here. *Lehmann*, 342 Ill. App. 3d at 1078, 796 N.E.2d at 1172; *Pisano v. Giordano*, 106 Ill. App. 3d 138, 140, 435 N.E.2d 899, 901 (4th Dist. 1982) ("A judge sitting in an administrative review proceeding is expressly forbidden to go outside the record in rendering a decision.").

Finally, the Court is not persuaded that *People v. Botsis*, 388 Ill. App. 3d 422, 902 N.E.2d 1092 (1st Dist. 2009), somehow demonstrates that Plaintiff should not have been fired because "it is very uncertain . . . whether, and to what extent the defense would actually be allowed to introduce" evidence of Plaintiff's untruthfulness at trial. (Doc. 203, at 11). The defendant in *Botsis* was involved in a car accident that led to his being convicted of reckless homicide and aggravated reckless driving. At the trial, Officer David Saifuku testified about statements the defendant made to him in the emergency room following the accident. 388 Ill. App. 3d at 428, 902 N.E.2d at 1096-97. On appeal, the defendant objected that the State violated his right to a fair trial by failing to disclose Officer Saifuku's criminal history and disciplinary records in violation of *Brady*. *Id.* at 437, 902 N.E.2d at 1104. Specifically, though the defendant knew that Officer Saifuku had been charged with two felonies and had pled guilty to misdemeanor battery and disorderly conduct in Wisconsin, he did not know that this misconduct had also led to disciplinary action by the police department. Nor did he know about a second disciplinary action stemming from the officer's failure to issue a ticket to an unlicensed driver. *Id.* at 438, 902 N.E.2d at 1104.

The Illinois Appellate Court held that evidence of Officer Saifuku's prior bad acts was "of little relevance" and did not affect the outcome of the trial because the officer's "credibility was not a serious issue in this case." The court explained that the defendant "never contended his statements to Saifuku were coerced," nor did he "suggest[] Saifuku testified falsely regarding the content of defendant's statements." *Id.* at 439, 902 N.E.2d at 1105. Since "Saifuku's testimony played a minor role in the State's case," the court declined to overturn the defendant's convictions on that basis. *Id.*

Unlike Officer Saifuku, whose credibility was "not a serious issue," Plaintiff has been found guilty of lying to his superiors in a formal police investigation of a potential violation of law committed by Plaintiff, as well as in a later internal investigation in which Plaintiff's lies were recorded and made by him after being placed under oath. Such express dishonesty would certainly be an issue in any criminal proceeding in which he testified to disputed matters. The Board reasonably concluded that given the nature of Plaintiff's misconduct, which included repeatedly lying to his superiors about damaging public property, during both informal and formal investigations, discharge was an appropriate discipline. *Sutton*, 91 Ill.2d at 411, 438 N.E.2d at 151. *See also Merrifield v. Illinois State Police Merit Bd.*, 294 Ill. App. 3d 520, 530, 691 N.E.2d 191, 199 (4th Dist. 1998) ("[B]ecause the Board is in the best position to determine the effect of the officer's conduct on the operations of the Department, its determination of 'cause' will be given considerable deference.").

## CONCLUSION

For the reasons stated here, the Board's decision to discharge Plaintiff for cause is affirmed. Judgment is entered in favor of the Board on Count II of the Complaint.

ENTER:

Dated: February 7, 2014

SHEILA FINNEGAN
United States Magistrate Judge