# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **BRUCE M. BRADFORD** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 11 C 37** |
| | ) | |
| **VILLAGE OF LOMBARD, POLICE** | ) | **Magistrate Judge Finnegan** |
| **CHIEF RAY BYRNE, individually, and** | ) | |
| **BOARD OF FIRE AND POLICE** | ) | |
| **COMMISSIONERS OF THE VILLAGE OF** | ) | |
| **LOMBARD,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Bruce M. Bradford claims that Defendants the Village of Lombard (the "Village") and Police Chief Ray Byrne ("Chief Byrne"), in his individual capacity, caused his termination as a police officer in retaliation for filing a prior lawsuit for unpaid overtime under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*. Currently before the Court is Defendants' motion in limine to bar from trial evidence of certain Lombard Police Department ("LPD") officer misconduct incidents. For the reasons set forth here, the motion is granted in part and denied in part.

## BACKGROUND[1]

Plaintiff became an LPD police officer in 1998. In August 2009, he filed a lawsuit against the Village under the FLSA, seeking compensation (and liquidated damages) for hours spent caring for a police canine in his home after his shift each day. (Case No. 09 C 4777). The parties settled that lawsuit in April 2010 and the case was dismissed

---

[1] This opinion assumes the reader's familiarity with the facts of this case as set forth in the Court's February 7, 2014 decision, *Bradford v. Village of Lombard*, No. 11 C 37, 2014 WL 497677 (N.D. Ill. Feb. 7, 2014).

with prejudice on June 29, 2010. Eleven days later, on July 9, 2010, Chief Byrne filed formal charges against Plaintiff with the Board of Fire and Police Commissioners of the Village of Lombard (the "Board"). Plaintiff believes the charges were retaliation for his filing the FLSA claim. Defendants say the charges stemmed from Plaintiff's misconduct in (1) leaving the scene of an accident on March 20, 2010 after damaging a fire hydrant with his personal vehicle, (2) failing to report the accident, and (3) repeatedly lying about it during a subsequent police investigation.

The Board held an evidentiary hearing on October 23, 2010 and heard sworn testimony from Plaintiff, who was represented by counsel, and eight other witnesses. Shortly thereafter, on December 2, 2010, the Board concluded that Plaintiff was guilty of the charges based on the following factual findings: (1) two independent witnesses with no motive to lie credibly testified that they saw Plaintiff hit and damage the hydrant, immediately pull over and get out of his vehicle to check for damage, and then leave the scene, prompting them to call 911; (2) Plaintiff knew that he had hit the fire hydrant in part because he saw that his car was damaged on the right front passenger side with some red paint transfer from the hydrant and a missing lamp bevel, but he did not report the incident to anyone despite proceeding directly to work at the police station; (3) Plaintiff first admitted he may have hit "something" when he saw Sergeant Marilyn A. Gabinski photographing his vehicle in response to the 911 call; (4) Plaintiff made untruthful statements about the incident to Sgt. Gabinski, Sergeant William Marks, Lieutenant Tom Wirsing and Lieutenant Scott Watkins during informal and formal interrogations, and his testimony at the evidentiary hearing similarly was not credible; and (5) Plaintiff made those untruthful statements in an attempt to justify his failure to

report the accident as required by law, and to deceive LPD officers regarding his knowledge of a property damage accident and his failure to report it.

The Board determined that Plaintiff's actions relating to this incident merited his discharge for cause. In reaching this conclusion, the Board relied in part on an uncontested affidavit from Robert Berlin, Chief of the Criminal Division of the DuPage County State's Attorney's Office, who stated that the LPD would be required to disclose Plaintiff's untruthfulness whenever he was involved in a criminal prosecution. As the Board explained, this would bring the LPD into disrepute and could further result in Plaintiff being impeached as a witness, calling into question all of his arrests. The Board also found that Plaintiff's false statements related directly to his duties as a police officer, and that his conduct would affect officer morale and undermine public confidence in the police department.

On February 7, 2014, this Court affirmed the Board's factual findings and its decision to discharge Plaintiff as a result of the March 2010 incident. *Bradford v. Village of Lombard*, No. 11 C 37, 2014 WL 497677 (N.D. Ill. Feb. 7, 2014). Plaintiff's FLSA retaliation claim remains pending and is set to proceed to trial on September 8, 2014. Plaintiff has informed Defendants that he intends to offer evidence of other LPD police officers who engaged in similarly serious misconduct but did not file FLSA claims and were not formally charged by Chief Byrne. Defendants seek to bar this evidence on the grounds that the police officers at issue are not similarly situated to Plaintiff in all relevant respects.

## DISCUSSION

**A. Standard of Review**

A motion in limine is "any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered." *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984). *See also Mason v. City of Chicago*, 631 F. Supp. 2d 1052, 1055 (N.D. Ill. 2009) (citing *Wilson v. Williams*, 182 F.3d 562, 570 (7th Cir. 1999) ("A motion in limine is a request for the court's guidance concerning an evidentiary question."). District courts have broad discretion in ruling on motions in limine, but evidence should not be excluded before trial unless it is clearly inadmissible on all potential grounds. *Betts v. City of Chicago, Ill.*, 784 F. Supp. 2d 1020, 1023 (N.D. Ill. 2011). Otherwise, rulings should be deferred until trial so that questions of foundation, competency, relevancy, and potential prejudice may be resolved in proper context. *Id. See also Thomas v. Sheahan*, 514 F. Supp. 2d 1083, 1087 (N.D. Ill. 2007).

"The denial of a motion in limine [to bar evidence] does not mean that the evidence is necessarily admissible, rather, it means only that the party moving in limine has not demonstrated that there is no possible basis for the admission of the evidence." *Austin v. Cook County*, No. 07 C 3184, 2012 WL 1530452, at *1 (N.D. Ill. Apr. 30, 2012). Accordingly, "[t]rial judges may alter prior 'in limine rulings, within the bounds of sound judicial discretion.'" *Kiswani v. Phoenix Sec. Agency, Inc.*, 247 F.R.D. 554, 557 (N.D. Ill. 2008) (quoting *Townsend v. Benya*, 287 F. Supp. 2d 868, 872 (N.D. Ill. 2003)).

**B. Similarly Situated Officers**

Defendants seek to bar evidence of 22 misconduct incidents involving at least 15 different LPD police officers. At issue here is whether these other police officers are

similarly situated to Plaintiff for purposes of his retaliation claim. "The similarly-situated analysis calls for a 'flexible, common-sense' examination of all relevant factors," and is "usually a question for the fact-finder." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (quoting *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007) and *Srail v. Village of Lisle, Ill.*, 588 F.3d 940, 945 (7th Cir. 2009)). Though similarly situated employees "must be 'directly comparable' to the plaintiff 'in all material respects,' . . . they need not be identical in every conceivable way." *Id*. (quoting *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 365-66 (7th Cir. 2009)). The key is that the distinctions cannot be "so significant that they render the comparison effectively useless." *Id*. Usually, this means the plaintiff must show that the comparators "(1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Id*. at 847 (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)).

In disparate discipline cases, "the similarly-situated inquiry often hinges on whether co-workers 'engaged in comparable rule or policy violations' and received more lenient discipline." *Id*. at 850 (7th Cir. 2012) (quoting *Naik v. Boehringer Ingelheim Pharms., Inc.*, 627 F.3d 596, 600 (7th Cir. 2010)). Comparators need not have engaged in identical or precisely equivalent misconduct as the plaintiff, but it must be "of comparable seriousness." *Id*. at 850-51 (citing *Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 689 (7th Cir. 2007)). In *Coleman*, for example, a plaintiff who had "thoughts" about killing her boss was similarly situated to proposed comparators who threatened another employee with a knife. *Id*. at 851. *See*

*also Baker v. Macon Resources, Inc.*, 750 F.3d 674, 676-77 (7th Cir. 2014) (employee who witnessed physical abuse of a resident was similarly situated to employee who had "reason to believe" the abuse had occurred).

## C. Analysis

With this background in mind, the Court turns to a consideration of the disputed incidents. Before doing so, however, the Court must briefly address Plaintiff's assertion that Judge Bucklo (who presided over this case prior to the parties' consent to this magistrate judge) already found that all of the officers in question are similarly situated to him. (Doc. 213, at 2). Citing the law of the case doctrine, Plaintiff argues that this Court is bound by Judge Bucklo's July 30, 2012 Minute Order stating:

> [G]iven plaintiff's evidence that defendant Lombard, through Byrne, treated plaintiff's alleged infraction substantially differently than Byrne had treated arguably more egregious actions by similarly situated officers, . . . summary judgment should not have been given.

(Doc. 114). The Court is not persuaded that this order precludes a separate ruling on Defendants' motion in limine.

"The doctrine of law of the case establishes a presumption that a ruling made at one stage of a lawsuit will be adhered to throughout the suit." *Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1227 (7th Cir. 1995). The doctrine reflects the principle that litigants have a "rightful expectation . . . that a change of judges mid-way through a case will not mean going back to square one," and it thus precludes a new judge from altering previous rulings "merely because he has a different view of the law or facts from the first judge." *Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005) (internal quotations omitted). At the same time, the law of the case doctrine is "no more than a presumption, one whose strength varies with the circumstances; it is not a

straightjacket." *Alston v. King*, 157 F.3d 1113, 1116 (7th Cir. 1998) (quoting *Avitia*, 49 F.3d at 1227). In assessing whether the doctrine applies, "it is critical to determine what issues were actually decided in the prior ruling." *Fletcher v. OneWest Bank, FSB*, No. 10 C 4682, 2012 WL 5199632, at *2 (N.D. Ill. Oct. 22, 2012).

Here, Plaintiff vastly overstates the scope of Judge Bucklo's ruling. Though the district judge held that Plaintiff generally had provided enough comparator evidence to avoid summary judgment, she declined to consider whether each specific police officer (or each cited incident) meets the similarly situated standard. Nor did she in any way indicate that every single one of those officers affirmatively qualifies as a proper comparator. (Doc. 114). More importantly, Judge Bucklo did not have occasion to address the issue presented here, namely, whether and to what extent the proposed comparator evidence is admissible at trial. *Cf. Fletcher*, 2012 WL 5199632, at *2 (quoting *Brengettcy*, 423 F.3d at 680) ("A judge should not reconsider a preceding judge's rulings when presented with 'precisely the same question in precisely the same way' as the preceding judge."). As a result, the law of the case doctrine does not apply, and this Court may properly determine whether a jury should hear evidence relating to these other individuals.

### 1. Comparator A

Turning back to the incidents in question, Plaintiff first wants to tell the jury about four car accidents involving Comparator A. The first occurred on August 27, 2004, when Comparator A drove his squad car through wet cement on a roadway, causing more than $5,000 of damage ("AI"). Approximately 1 1/2 hours later, after the "check engine" light went on in the squad car, he told his supervisor that he may have hit

"something." A few days later, on August 31, 2004, the concrete company that had laid the cement reported to the police that a Lombard squad car had driven through the wet cement, damaging the roadway. The next day Comparator A disclosed for the first time in a written memo that he had washed the squad car shortly after driving through the wet cement, which he said he believed at the time to be dirt and mud. (Doc. 181, at 8; Doc. 85, at 7; Memo from Comparator A to Lt. Glennon of 9/1/04).

In a second incident on April 9, 2005, Comparator A was involved in a motor vehicle accident while on duty and driving an LPD squad car ("AII"). He did not leave the scene, and there is no evidence that he made false statements during the police investigation of that accident. The Village determined, however, that he was at fault for the incident, which resulted in more than $1,500 in damages. (Doc. 181, at 9; Doc. 85, at 8).

Comparator A was involved in another motor vehicle accident while on duty on June 7, 2006 ("AIII"). While he did not leave the scene, he told the investigating officer that he felt the brakes were not working properly at the time of the incident. The brake pads had less than 2,500 miles of wear, however, and an inspection found no mechanical defects. (Doc. 181, at 9; Doc. 85, at 8).

Finally, a fourth incident occurred on December 11, 2008 when Comparator A rear-ended another vehicle while on duty driving his squad car ("AIV"). There is no evidence of any false statements made by Comparator A during the police investigation of this accident.

Chief Byrne did not file formal charges against Comparator A in connection with any of these incidents. In fact, it appears that the individual was not disciplined at all for

AI, AII or AIV, and his discipline for AIII consisted of a letter of reprimand and a referral to a driving course. Defendants argue that none of these motor vehicle incidents is of comparable seriousness to Plaintiff's hitting the fire hydrant because Plaintiff is the only one who lied about his actions. They direct the Court to *Antonetti v. Abbott Labs.*, 563 F.3d 587 (7th Cir. 2009), where the employer fired the plaintiffs for taking an off-site breakfast, but retained another employee, Juan Luna, who had accompanied them. *Id.* at 589-90. The employer explained the discrepancy by noting that the plaintiffs all told their group leader that they had not taken any unauthorized breaks on the day in question, whereas Luna admitted that the group had gone out for breakfast. *Id.* at 590. On appeal from a grant of summary judgment in favor of the employer, the Seventh Circuit affirmed that Luna was not a proper comparator because he "did not tell [his group leader] that he took no lunch, and he was honest about the incident when questioned – mitigating circumstances that differentiate his conduct and [the employer's] treatment of him." *Id.* at 592 n.5. *See also Hall v. Village of Flossmoor, Ill.*, 520 Fed. Appx. 468, 472-73 (7th Cir. 2013) (where the plaintiff "lied repeatedly during an official investigation of his conduct," the dishonesty was "a significant aggravating circumstance" such that he was not similarly situated to other employees who engaged in comparable conduct).

There is no evidence that Comparator A lied in connection with the motor vehicle accidents involved in AII and AIV, but there is some evidence that he was less than truthful with respect to the other two incidents. For example, like Plaintiff, Comparator A left the scene after causing damage to property (newly cemented pavement) and only later reported hitting "something" after the squad car's check-engine light went on. He

failed to disclose the car wash until several days later. Though Comparator A claimed he thought the cement was "dirt and mud," (Memo from Comparator A to Lt. Glennon of 9/1/04), a jury could reasonably find that he knew it was cement and washed the car to prevent detection and/or further damage, but was deliberately vague about the incident to avoid discipline.[2] The same is true of AIII, where Comparator A may have tried to evade responsibility for a car accident during a police investigation by saying the brakes were not working properly. Notably, the investigating officer determined that the crash was chargeable, and that "[t]he contributory factor" was not mechanical failure but "excessive speed which caused [Comparator A] to be unable to control [his] car while attempting to turn." (Byrne Dep., Ex. 6, at 033). *See Coleman*, 667 F.3d at 851 ("Where a proposed comparator violated the same rule as the plaintiff in an equivalent or more serious manner, courts should not demand strict factual parallels.").

Defendants find it significant that Plaintiff violated a criminal statute, 625 ILCS 5/11-404, when he hit the hydrant and failed to report it, whereas Comparator A did not violate any law when he drove through the cement. (Doc. 181, at 8). Since the statute in question requires drivers of vehicles that collide with and cause damage to "property" to report the incident, however, Comparator A arguably violated the statute if he knew that he caused damage to the roadway by driving the vehicle through wet cement. The Court is also not persuaded to preclude the evidence because "[u]nlike [Plaintiff], [Comparator A] never lied about his actions while under oath during a formal

---

[2] Deputy Chief Dane Cuny recommended that Chief Byrne not impose any discipline for the cement incident due to "questions pertaining to proper barricade protection of the site and if [Comparator A] was actually involved." (Memo from Cuny to Byrne of 10/5/04). Since Defendants do not dispute Plaintiff's assertion that Chief Byrne affirmatively knew Comparator A was the responsible party, a jury could find that Deputy Chief Cuny's recommendation is not sufficient to explain why the Chief decided not to charge Comparator A and to only charge Plaintiff.

interrogation." (*Id*.).  Defendants now concede that Plaintiff was not in fact under oath during his formal interrogation, and it is undisputed that he hit the hydrant in his personal vehicle while off duty.  Comparator A, on the other hand, was on duty and driving an LPD squad car when he (1) damaged a roadway by driving through the wet cement and may have tried to conceal this by washing the car (AI), and (2) was in an accident and may have attempted to avoid a ticket and discipline by telling the investigating officer that the brakes were faulty (AIII).  A jury could reasonably conclude that an officer's attempt to cover up on-duty conduct is of comparable seriousness to a lie about private conduct.

Defendants finally suggest that Plaintiff's lies were more serious than Comparator A's lies because the former would have to be disclosed whenever Plaintiff was involved in a criminal prosecution.  (Doc. 215, at 7).  According to Defendants' own cited case, however, the same would be true for Comparator A's lie had he received any discipline.  (*Id*.) (citing *Milke v. Ryan*, 711 F.3d 998, 1012, 1019 (9th Cir. 2013) (*Brady* requires the disclosure of any police personnel records reflecting discipline for lying or untruthfulness).

In sum, Plaintiff does not dispute that lying is a significant aggravating circumstance for purposes of the similarly situated analysis, and Defendants' motion in limine is therefore granted as to AII and AIV.  The motion is denied as to AI and AIII, however, since a reasonable jury could find that like Plaintiff, Comparator A tried to cover up the nature of his accidents but received no discipline.

## 2.    Comparator B

The next proposed comparator, Comparator B, was likewise involved in four incidents Plaintiff says are of comparable seriousness to his damaging the fire hydrant and lying about it.  The first occurred on October 24, 2003 when Individual 1 accused Comparator B of leaving work early ("BI").  Comparator B accused Individual 1 of lying about what he saw, but it turned out that he simply did not have all of the pertinent information about Comparator B's schedule.  Chief Byrne ultimately issued Individual 1 a written reprimand for accusing Comparator B of lying without having a reasonable belief that he had done so.  (Doc. 181, at 11; Doc. 85, at 9).  The second incident occurred in April 2006 when Comparator B, while off duty, allowed a non-officer friend to wear his uniform and badge to march in the Chicago St. Patrick's Day Parade ("BII").  (Doc. 181, at 12-13; Doc. 85, at 9-10).  Comparator B purportedly did something similar in May 2005 when, again while off duty, he allowed the same non-officer friend to flash his badge at a Chicago Arena Rush football game so they both could access the field and "other places" ("BIII").  (Doc. 181, at 12-13; Doc. 85, at 10-11).

Finally, Comparator B periodically engaged in "shift splitting" with Individual 2 during the midnight shift, meaning that one person would leave early or arrive late while the other one covered the absence ("BIV").  For example, Comparator B arrived at 2:35 a.m. on May 1, 2006 for a shift that was supposed to start at 11:00 p.m. on April 30, 2006.  Comparator B also left at 5:14 a.m. on April 29, 2006 though he was scheduled to work until 7:15 a.m.  Similarly, Individual 2 left work at 3:01 a.m. on May 1, 2006 though his shift did not end until at least 7:00 a.m.  He also left at 4:42 a.m. on November 22, 2005 when he again was supposed to work until at least 7:00 a.m.  (Doc.

85, at 11). Neither Comparator B nor Individual 2 had permission to leave early or arrive late on these occasions, but they both received their full pay. (Doc. 181, at 14, Doc. 85, at 11-12).

The Court does not see how BI satisfies the similarly situated test as it was essentially a misunderstanding among colleagues. The uniform and badge incidents are also distinguishable. Chief Byrne issued Comparator B a one-day suspension for allowing his friend to wear his uniform and badge in a parade, citing the following "mitigating factors": (1) he apologized for his actions; (2) he accepted full responsibility for them; and (3) the statutes at issue "were intended to prevent individuals from committing crimes or gaining access to unauthorized areas while facilitating their activities with a law enforcement uniform," concerns not raised by marching in a parade. (Doc. 85, at 10). Not only is the nature of the misconduct different, but Plaintiff never took responsibility or apologized for his actions.

Though Comparator B's conduct in allowing his friend to flash a badge to access special areas during the football game does appear to violate the relevant statutes as described by Chief Byrne, an LPD internal investigation found no evidence to sustain the allegations. (Doc. 181, Ex. 3, Byrne Aff., ¶ 57). This is likely because the incident was not reported to the LPD until April 2006, nearly a year after it allegedly occurred. In that regard, Plaintiff states that "in April 2006, Sgt. [David] Kundrot advised Deputy Chief Cuny (who then advised Chief Byrne) that a Lombard business owner . . . told him [at some unspecified time] that in May 2005" Comparator B let his friend flash a badge at a Rush game. (Doc. 85, at 10). In response to Sgt. Kundrot's allegation, Lieutenant James Glennon interviewed the business owner about the incident on May 5, 2006.

(*Id*.).  There was no similar delay in reporting Plaintiff's accident since the witnesses called 911 as it was happening.

With respect to the shift splitting, the Court finds that Plaintiff has raised a question of fact as to whether Comparator B and Individual 2 are similarly situated to him since they both lied on numerous occasions about how long they were on duty and collected full pay for days when they only worked partial shifts.  Defendants stress that Chief Byrne declined to impose discipline because no LPD policy or procedure informed them that shift splitting was prohibited during the midnight shift, which he deemed a policy failure.  (Doc. 181, at 15).  A jury could reasonably conclude, however, that Comparator B and Individual 2 should have known that they were not allowed to be paid for time they did not actually work.  Though there is no evidence that Comparator B and Individual 2 lied about the misconduct once confronted, their repeated lies about the hours they worked as reported on their payroll records are arguably of comparable seriousness to the repeated lies from Plaintiff, and a jury must determine whether the decision to discipline Plaintiff alone was motivated by discriminatory animus.

In sum, Plaintiff has not demonstrated that Comparator B is similarly situated with respect to incidents BI, BII or BIII, but he has a raised a question of fact as to incident BIV.  Defendants' motion in limine regarding Comparator B is granted in part and denied in part.

### 3.    Comparator C

On January 19, 2006, Chief Byrne filed a formal complaint against Comparator C based on the possibility that he had engaged in obstruction of justice in connection with the LPD's arrest of his relative for a crime.  (Doc. 84-2, Byrne Dep. Ex. 15).  Specifically,

on December 23, 2005, Lt. Watkins, Detective Benny Ranallo and Detective Terry Evoy went to the relative's house to investigate the allegations and noticed his long and dirty fingernails. At a follow-up home visit to execute arrest and search warrants some hours later (the latter expressly for fingernail scrapings/clippings), the relative's nails had been cut so short that some of the fingertips were bleeding. Comparator C was present at the second visit and had a digital camera with him. Lt. Watkins and his colleagues consulted with DuPage County Assistant State's Attorney Bob Dore, who agreed that if Comparator C had in fact instructed his relative to trim his nails to destroy evidence, it could amount to Official Misconduct. (Doc. 181, at 15; Doc. 85, at 12; Investigation Report, Byrne Interview of 1/23/06, at 4; Investigation Report, Dore Interview, at 17).

Chief Byrne assigned Lt. Glennon to investigate the formal complaint against Comparator C. (Investigation Report, Byrne Interview of 1/23/06, at 5). On March 2, 2006, Lt. Glennon emailed Chief Byrne a copy of his internal investigation report recommending that the charges be deemed unfounded.[3] Based on his interviews with Chief Byrne, Lt. Watkins, Det. Ranallo, Det. Evoy, ASA Dore, and Comparator C, Lt. Glennon found no evidence to support any inference that Comparator C had "acted in an effort to destroy evidence and protect his [relative]." (*Id*. at 22). As Lt. Glennon explained, his investigation uncovered no evidence that Comparator C: (1) knew the LPD officers needed the fingernails for evidence of a crime; (2) knew the officers planned to obtain a search warrant for that evidence; or (3) knew the victim had suffered a possible fingernail scratch or any other injuries. Nor was there evidence that Comparator C had learned that information from his relative, as none of the officers at

---

[3]     A separate investigation by the Assistant State's Attorney's Investigative Division ended with no criminal charges being filed against Comparator C. (Memo from Byrne to Lt. Glennon of 1/19/06).

the scene "suggested or indicated to [the relative] that his fingernails were of interest to them." (*Id*. at 23). In that regard, the officers had a conversation at the LPD station following the initial home visit during which they agreed there was no "exigency" in obtaining the search warrant "since there was no indication given to the suspect that the fingernails were of importance." (*Id*. at 22-23).

Plaintiff makes much of the fact that when Lt. Glennon emailed Chief Byrne the report, he stated in the first paragraph that it was a "rough draft if you want it to be. however, it is final in my mind. Whatever you want I will do." (Email from Glennon to Byrne of 3/2/06). Plaintiff suggests that this constitutes evidence that Chief Byrne had reservations about punishing Comparator C, (Doc. 85, at 12), but a review of the documents makes it clear that the subject of concern was actually Lt. Watkins. As Lt. Glennon stated in his report, Lt. Watkins had "focused on [Comparator C's] conduct from the beginning" rather than on the underlying case, and was the first person to suggest that Comparator C had helped his relative destroy evidence. This made Lt. Glennon "question [the lieutenant's] judgment and motivation concerning [Comparator C] and his actions." (*Id*. at 23, 24). Consistent with these findings, the second paragraph of Lt. Glennon's email notified Chief Byrne that "[i]t was impossible not to bring up the motivation of [Lt. Watkins]" in the report, and expressed his belief that Lt. Watkins "had some agenda or [u]lterior motive here." (Email from Glennon to Byrne of 3/2/06).

Ultimately, Chief Byrne accepted Lt. Glennon's recommendation that the charges result in a finding of "Unfounded," (Memo from Byrne to Comparator C of 3/1/06), and explained in an email submitted in support of Defendants' motion in limine that there

was a lack of supporting evidence such as eyewitness statements, admissions or physical evidence. (Doc. 181, at 15-16; Doc. 181, Ex. 3, Byrne Aff., ¶ 73). A few months later, in December 2006, the alleged victim of the crime filed a federal lawsuit against the Village and Comparator C, charging them with knowingly directing or permitting the relative to destroy evidence. The district court dismissed the federal Section 1983 claims in September 2007 for failure to state a claim, and declined to exercise supplemental jurisdiction over the remaining state law claims for spoliation of evidence.[4] *Doe v. Village of Lombard*, No. 06 C 7048, 2007 WL 2788838 (N.D. Ill. Sept. 21, 2007).

The following year, in October 2007, the Village of Lombard retained an outside attorney to conduct a formal inquiry into allegations Comparator C made against Lt. Watkins relating to his involvement in the investigation of Comparator C's relative. The outside attorney found that "circumstantial evidence plus [Comparator C's] experience as a trained investigator, provide some basis for suspecting that [Comparator C] may have had something to do with the cutting of his [relative]'s fingernails." (Doc. 84 ¶ 161; Doc. 85, at 13). As a result, Lt. Watkins did not face any discipline relating to the allegations he made against Comparator C.

Defendants argue that Comparator C is not similarly situated to Plaintiff because the investigation into his misconduct did not produce evidence that he had violated any laws or LPD policies, procedures or orders, and he never lied under oath during a formal interrogation. (Doc. 181, at 16). As noted earlier, Defendants now concede that Plaintiff was not under oath during his formal interrogation. Regardless, the Court agrees that Comparator C is not similarly situated to him. After interviewing all of the

---

[4]     It is unknown whether the alleged victim pursued the spoliation claims in state court.

relevant witnesses, Lt. Glennon found no direct or circumstantial evidence establishing that Comparator C instructed his relative to trim his nails, much less that Comparator C lied about his actions in that regard. Moreover, Lt. Glennon informed Chief Byrne that Lt. Watkins may have had an ulterior motive in accusing Comparator C of wrongdoing. Conversely, two impartial witnesses saw Plaintiff hit the fire hydrant so hard that it turned, stop to check his vehicle for damage, and then drive away as they followed him. In addition, the vehicle had red paint transfer from the hydrant, as well as a missing lamp bevel that was retrieved from the accident scene. Despite this evidence, Plaintiff repeatedly lied about his actions on the day in question.

Given these clear distinguishing factors, no reasonable jury could conclude that Chief Byrne's failure to pursue charges against Comparator C is evidence that he acted with a retaliatory motive in charging Plaintiff. Chief Byrne had direct physical and testimonial evidence of Plaintiff's misconduct and a recommendation from Lt. Wirsing that the charges be sustained. The charges against Comparator C, on the other hand, were wholly unsubstantiated and Lt. Glennon recommended that they be deemed unfounded. *See Coleman*, 667 F.3d at 846 ("[T]he proposed comparator must be similar enough to permit a reasonable juror to infer, in light of all the circumstances, that an impermissible animus motivated the employer's decision."). Defendant's motion in limine as to Comparator C is granted.

### 4. Comparator D

On July 4, 2005, Comparator D was scheduled to work overtime providing security for Lombard's Fourth of July Fireworks display. He left his duty assignment early without authorization, and then submitted an overtime sheet requesting full

payment.  (Memo from Kundrot to Glennon of 7/7/05).  Chief Byrne initiated an informal inquiry led by Sgt. Kundrot, during which Comparator D "admitted to abandoning his traffic post without permission and to falsifying an overtime sheet."  (Memo from Kundrot to Cuny of 7/22/05).  Comparator D also stated, "If I am guilty so is the other officer at my house," but he refused to divulge that other officer's identity.  (*Id.*).  Sgt. Kundrot described Comparator D as "defensive and arrogant," and recommended that he receive a one-day suspension without pay.  (*Id.*).  Chief Byrne sustained the charges of leaving an assigned post without authorization and seeking overtime pay "for work beyond the hours you were actually present," and imposed the recommended one-day suspension.  (Doc. 181, at 16; Doc. 85, at 13; Memo from Byrne to Comparator D of 8/9/05).  Comparator D challenged that decision, but the Lombard Village Manager upheld the choice of discipline on September 2, 2005, stressing that Comparator D did not dispute the fact that he had left his post early without permission.  (Doc. 85, at 13; Memo from Lichter to Comparator D of 9/2/05).

Defendants argue that the incident with Comparator D is "not probative" of Chief Byrne's "alleged retaliatory disciplinary actions against [Plaintiff]" because Comparator D "did not lie under oath during a formal interrogation."  (Doc. 181, at 17).  Once again, Defendants now concede that Plaintiff was not in fact under oath for his formal interrogation.  In addition, while it is true that Comparator D admitted to leaving early and submitting a false overtime request, he also refused to name another officer he said violated the same rule, which could be construed as impeding an investigation. Notably, neither Sgt. Kundrot nor Chief Byrne made any effort to investigate the identity of the other officer or pursued charges against Comparator D relating to his refusal to

cooperate. A reasonable jury could find that falsifying time records and impeding an investigation into related misconduct is of comparable seriousness to Plaintiff's lies about damaging a Village fire hydrant. Defendants' motion in limine as to Comparator D is denied.

### 5. Comparator E

On January 6, 2011, Chief Byrne initiated a formal investigation into allegations that during a seatbelt enforcement campaign, Comparator E created a record indicating he had made two traffic stops on November 24, 2010 involving drivers not wearing seatbelts when in fact he had not made any stops.[5] Chief Byrne assigned Lieutenant John Lavery to conduct an informal investigation, which then turned into a formal one with several witness interviews and an interrogation of Comparator E on January 14, 2011 in the presence of counsel. Comparator E testified that he could not recall who he allegedly stopped on the morning in question, what the individuals looked like, whether they were male or female, the kind of vehicles they were driving, or where the stops occurred. (Interrogation of 1/14/11, at 9-15).

In a report dated February 15, 2011, Lt. Lavery informed Chief Byrne that "[s]ince there have been no independent statements, observations or evidence presented to conclusively prove whether or not [Comparator E] had made two traffic stops/contacts on the morning of November 24, 2010, there cannot be a finding that [he] had falsified his activity sheet." (Investigation Report of 2/15/11, at 12). Lt. Lavery also found that Comparator E "did not violate applicable state laws, [or] any village rule, regulation," and therefore recommended that the charges be "Not Sustained due to the lack of direct

---

[5] It appears that officers who fail to meet the Illinois Department of Transportation ("IDOT") goal of two seatbelt citations per hour may be disqualified from working further IDOT seatbelt overtime. (Interrogation of Comparator E, at 7).

evidence." (*Id*. at 12, 13). Chief Byrne accepted that recommendation and did not discipline Comparator E, explaining in his affidavit in support of Defendants' motion in limine that he "could not prove with evidence that [the individual] had, in fact, violated any LPD General Orders." (Doc. 181, Ex. 3, Byrne Aff., ¶ 79).

Unlike the situation with Plaintiff, where two impartial witnesses saw him hit the fire hydrant and provided testimony that directly contradicted his version of events, no one reported having any first-hand knowledge as to whether Comparator E made the two traffic stops, or suggested that his statements in that regard were false. In addition, Lt. Wirsing recommended that the charges against Plaintiff be sustained, whereas Lt. Lavery told Chief Byrne he was unable to confirm the allegations against Comparator E. On this evidence, no reasonable jury could conclude that Chief Byrne decided to pursue charges against Plaintiff because he, unlike Comparator E, had filed an FLSA claim. *See Coleman*, 667 F.3d at 846. Comparator E is not similarly situated to Plaintiff and Defendants' motion in limine to bar evidence of his misconduct is granted.

### 6. Comparator F

On June 23, 2010, Comparator F's wife filed a domestic violence report against him, claiming that earlier that day, he would not allow her to leave the house, cornered her against the wall, and ripped their 2-year-old child from her arms, causing bruising. Chief Byrne assigned Lt. Wirsing to conduct a formal investigation, which began with an interview of the wife on July 20, 2010. (Doc. 181, at 18; Doc. 84-19, at 23 of 24). The wife told Lt. Wirsing that her husband (1) ran into the bedroom screaming about money issues; (2) ran into the bathroom shouting that she was a whore and accusing her of stealing money; (3) pinned her arms above her head by grabbing her triceps against the

wall and not letting her leave; (4) shouted that the couple's child would be better off if her mother was dead; and (5) threw all of her property out of the dresser and night stand in an attempt to find evidence that she was cheating on him. (Doc. 181, at 18; Doc. 85, at 14).

During his official interrogation on August 4, 2010, Comparator F told Lt. Wirsing that he and his wife were having marital problems and acknowledged that they had an argument on June 23. Comparator F further admitted that he did most of the yelling, backed his wife up against a wall, blocked her way, "crowd[ed] her space," and "probably said the 'W' word," but he did not recall pinning her arms above her head or up against the wall. (Doc. 85, at 14; Doc. 84-19, at 10-19 of 24). Photos of Comparator F taken after the incident reflected that his wife had hit, kicked and scratched him during the altercation. (*Id.*). Lt. Wirsing ultimately concluded that the allegations against Comparator F were "Not Sustained," and Chief Byrne affirmed that decision on August 31, 2010. (Doc. 84-19, at 20 of 24).

The Court agrees with Defendants that Plaintiff is not similarly situated to Comparator F. Though Comparator F denied some of his wife's allegations, she can hardly be deemed a disinterested witness to the events in question. In contrast, Plaintiff denied statements made by two individuals who did not know him, had no personal reasons for reporting what they saw, and had no motive to lie. In these circumstances, no reasonable jury could infer from the incident with Comparator F that Chief Byrne was motivated to discipline Plaintiff more harshly for misconduct of comparable seriousness because he filed an FLSA claim. *See Coleman*, 667 F.3d at 846. This portion of the motion in limine is granted and Plaintiff cannot present the cited evidence to a jury.

### 7.    Comparators G and H

Comparators G and H both left a training class early without authorization on April 7, 2010.  Lieutenant Cyndy Abenante conducted an Informal Inquiry and reported that the individuals affirmatively admitted leaving early, apologized, expressed remorse and embarrassment, and "did not attempt to lie."  (Doc. 181, Ex. 5, at 73 of 83).  No reasonable jury could find that the single instances of misconduct by these two individuals are of comparable seriousness to Plaintiff's actions in damaging Village property, leaving the scene, and then repeatedly lying about it in order to deceive the LPD.  *Hall*, 520 Fed. Appx. at 472-73.  Nor does it allow an inference that Chief Byrne was motivated to discipline Plaintiff more seriously because he had filed an FLSA claim.  *See Coleman*, 667 F.3d at 846.  Defendants' motion in limine to bar evidence relating to these two individuals is granted.[6]

### 8.    Comparator I

In March 2003, a female officer informed her supervisor that Comparator I had massaged her neck and shoulders while she was typing a report in the LPD briefing room, making her feel uncomfortable.  The officer did not want to file a formal complaint but the supervisor initiated an informal inquiry.  (Doc. 181-1, Ex. 7, at 14 of 30).  Comparator I admitted that he probably did massage the female officer's shoulders "as a means of commending her," and said he would apologize to her since he did not mean anything personal by the action.  (*Id*. at 15 of 30).  Chief Byrne sustained the

---

[6]    Plaintiff does not challenge Defendants' motion with respect to a second incident involving Comparator H where he demonstrated a bad attitude when asked to assist in booking individuals taken into custody.  (Doc. 181, at 25-26).  That portion of the motion is granted as well.

allegation of sexual harassment, issued Comparator I a written reprimand, and ordered him to undergo "appropriate remedial training." (*Id*. at 17 of 18; Doc. 181, at 22).

Plaintiff fails to explain how Comparator I's admission to inappropriately massaging a female officer's shoulders on one occasion is of comparable seriousness to his own repeated lies about damaging Village property and attempts to deceive the LPD. *Hall*, 520 Fed. Appx. at 472-73. Plaintiff's mere speculation that the conduct "possibly violated . . . Title VII of the Civil Rights Act of 1964, the Illinois Human Rights Act, and/or the victim's constitutional rights under Section 1983," (Doc. 213, at 11), is wholly unfounded and insufficient to place the issue before a jury.

### 9. Comparator J

Comparator J was involved in two episodes of excessive force. On April 16, 2006, he "grabbed an arrestee by the back of the neck and then held the same individual by the arm and began pulling him off of the booking stool on which he was seated." (Doc. 181, at 23). On April 23, 2006, during the course of a DUI arrest, Comparator J "grabbed an arrestee's head and forced her to bend down and look at a damaged automobile wheel." (*Id*.). Comparator J reported the April 23 incident to Sergeant Roy Newton "on his own doing" and said he knew "I was wrong, call it a short fuse or not enough sleep, I was wrong." (Doc. 181-1, Ex. 8, at 21, 22 of 30). With respect to the April 16 incident, Comparator J prepared a memo to Lt. Lavery dated May 20, 2006 stating, "I wholeheartedly regret my actions of that night, and I am very sorry this occurred. I can say with absolute certainty this will never happen again." (Doc. 181-3, Ex. 8, at 6 of 85). Following an Internal Investigation that sustained the

allegations, Chief Byrne imposed a two-day suspension and ordered Comparator J to contact the Village's Employee Assistance Program.  (*Id*. at 16 of 85).

Unlike Plaintiff, who repeatedly lied about his actions and refused to take responsibility for them, Comparator J was forthcoming and apologetic about his behavior.  Indeed, he proactively reported his April 23 misconduct and expressed remorse for both incidents.  This contrition is a clear "mitigating circumstance[] that differentiate[s] his conduct and [Defendants'] treatment of him."  *Antonetti*, 563 F.3d at 592 n.5.  No reasonable jury could find Plaintiff similarly situated to Comparator J, and Defendants' motion in limine is granted as to this individual.

### 10.    Comparator K

In 2005, Comparator K received a one-day suspension after he used a taser to shoot a fellow officer in the leg, purportedly as part of "an ongoing ribbing contest" the two officers had with each other.  Comparator K "readily admitted" using the taser during a photo session involving department personnel, but described the incident as a "joke," stating that he "wished he had not done this" and agreeing that his actions were improper.  (Doc. 181, at 24-25; Doc. 181-3, Ex. 9, at 25 of 85).  In the absence of any evidence that Comparator K lied about the one-time taser incident, no reasonable jury could conclude that it was of comparable seriousness to Plaintiff damaging Village property, leaving the scene and then repeatedly lying about it in an effort to deceive the LPD.  *Hall*, 520 Fed. Appx. at 472-73.  Plaintiff's speculation that Comparator K could have been charged with "a criminal assault/battery and may have violated the victim's constitutional rights under Section 1983" does not change this result, particularly since

the victim was a fellow officer and did not pursue any such charges. (Doc. 213, at 11). Plaintiff may not present evidence of the tasing incident at trial.

### 11. Comparator L

In June 2009, a citizen formally complained that Comparator L used excessive force on her when he grabbed her by the throat and pulled her hair while taking her to the ground during the course of an arrest. (Doc. 181, at 27). Lt. Lavery investigated the incident and Comparator L told him on June 24, 2009 that the arrestee "was struggling during the arrest and he could have accidentally put his hands onto her neck area when reaching for her shoulders." (Doc. 181-3, Ex. 11, at 62 of 85). Lt. Lavery concluded that Comparator L "became agitated and escalated a normal citizen encounter to an arrest situation, which was avoidable." (*Id*. at 63 of 85). Chief Byrne sustained the complaint and adopted Lt. Lavery's recommendation that Comparator L receive a letter of reprimand. (*Id*. at 68, 69 of 85).

Plaintiff does not explain why he is similarly situated to Comparator L except to say that his "misconduct possibly violated one or both the arrestees' constitutional rights as actionable under Section 1983 [sic]." (Doc. 213, at 12). There is no evidence that Comparator L lied about his actions or was deceitful in any way, and the Court does not believe a jury could find the single instance of misconduct to be of comparable seriousness to Plaintiff's repeated lies about what occurred when he hit the fire hydrant. Moreover, only Plaintiff engaged in affirmative efforts to mislead the LPD, which likewise "render[s] the comparison effectively useless." *See Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) (there must be "enough common features between the individuals to allow a meaningful comparison.").

### 12. Comparators M and N

In February 2011, the LPD investigated allegations that Comparator M may have tried to influence the disposition of two traffic citations that other officers had issued to a couple of his acquaintances. (Doc. 181, at 21). The investigation confirmed that Comparator M did not receive any favors in exchange for helping the acquaintances, and Chief Byrne issued him a written reprimand. (*Id*.). In October 2003, Chief Byrne learned that Comparator N improperly told a high school counselor about a confidential K-9 search scheduled for his school. During a formal inquiry, Comparator N said he thought the counselor already knew about the search and felt "terrible" about his mistake. Chief Byrne accepted the investigating officer's recommendation that Comparator N receive a Letter of Reprimand. (*Id*. at 28).

Plaintiff does not challenge Defendants' motion with respect to either of these incidents or offer any theory as to why the individuals are similarly situated to him. This portion of the motion is therefore granted.

### 13. Comparator O

On December 2, 2011, Individual 3 learned during a dinner conversation with several LPD officers that Comparator O may have engaged in sexual conduct with several women while he was on duty and in uniform. (Doc. 181-11, Ex. 13, at 17 of 90). Individual 3 reported this to Deputy Chief Wirsing in an email dated December 5, 2011, and the next day Chief Byrne directed Lt. Watkins to conduct an internal investigation. (Doc. 181-11, Ex. 13, at 16 of 90). Lt. Watkins, with assistance from Lt. Abenante and Deputy Chief Wirsing, interviewed 11 witnesses between December 6 and 11, 2011, including two of Comparator O's ex-girlfriends, Friend 1 and Friend 2, both of whom he

met in his capacity as an officer. (Doc. 181-11, Ex. 13, at 40-63 of 90). They also conducted an informal inquiry of Comparator O on December 9, 2011 and an interrogation interview of him on December 19, 2011. (Doc. 181-11, Ex. 13, at 64-90 of 90; Doc. 181-12, Ex. 13, at 2-16 of 25).

Comparator O admitted during the December 9, 2011 inquiry that he had sexual relations with three women – Friend 1, Friend 2 and Friend 3 – on multiple occasions while he was in uniform. He said this never occurred while he was on duty, but conceded that it occasionally happened in public places, such as in his personal vehicle "on North Avenue in Lombard." (Doc. 181-11, Ex. 13, at 64-65 of 90). He also reported that he "wouldn't send out a photo or a video of himself doing something of a sexual nature," though he "might have shared those with the particular sexual partner." (*Id*. at 65 of 90). During the December 19, 2011 interrogation, Comparator O stated that on approximately 5 occasions over a period of 8 months he in fact did have sexual relations with Friend 3 while he was on duty. (*Id*. at 68 of 90). He also mentioned a fourth sexual relationship with Friend 4. (*Id*.). Finally, Comparator O newly conceded that he sent Friend 1 a video of him receiving oral sex sometime after they had broken up, but claimed she had "asked for" proof of his relationship with another woman. (*Id*.).

Not surprisingly, Friend 1 said nothing about requesting the video. During her interview, she reported that she and Comparator O had broken up after he accused her of cheating: Comparator O said Friend 1's phone contained naked pictures of herself that she had sent to another man (*id*. at 86 of 90); Friend 1 said she had received a picture of a male friend's new baby. (*Id*. at 53 of 90). In any event, Friend 1 claimed that on two occasions thereafter they had sex in her apartment while he was on duty.

(*Id*. at 53-54 of 90). One of Friend 1's co-workers (Co-Worker 1) reported that the relationship "didn't end well," (*id*. at 41 of 90), another (Co-Worker 2) accused Comparator O of stalking behavior, (*id*. at 43 of 90), and Co-Worker 2 and Co-Worker 3 confirmed they saw Comparator O's sex video. (*Id*. at 40, 43 of 90).

On January 12, 2012, Lt. Watkins sent Chief Byrne his Internal Investigation report sustaining the charges against Comparator O. He first sustained the complaint that Comparator O "may have engaged in sexual activity while on duty," noting that the individual admitted to meeting up with Friend 3 for sex on at least 5 occasions while he was on duty and in uniform. In addition, Comparator O admitted having sexual relations with other women before and after his tours of duty, again while in uniform. (Doc. 181-12, Ex. 13, at 22 of 25). Lt. Watkins also sustained the complaint that Comparator O "may have electronically sent a lewd photo and/or video of himself to an ex-girlfriend with the intent to humiliate embarrass or anger her," as Friend 1 and two other witnesses reported seeing the video, and Comparator O admitted sending it. (Doc. 181-12, Ex. 13, at 22 of 25). Lt. Watkins recommended that Comparator O be suspended for his misconduct. (*Id*. at 23 of 25).

Five days later, on January 17, 2012, Chief Byrne suspended Comparator O for five days without pay and removed him from a three-year special assignment with the DuPage County Metropolitan Enforcement Group. (*Id*. at 18, 20 of 25). Chief Byrne explained that Comparator O admitted to engaging in sexual activity while on duty and in uniform, and stressed that some of that activity "took place in public locations such as parking lots" where the individual "could have been seen by members of the public." (*Id*. at 20 of 25). According to Chief Byrne, this behavior "would have resulted in great

embarrassment to the [LPD]." (*Id*.).  At the same time, the chief found that Comparator O "accepted full responsibility for his actions and cooperated in the internal investigation by truthfully admitting his wrongdoing." (*Id*.).

Defendants do not dispute that during the informal inquiry, Comparator O lied about having sex while on duty and sending a lewd video to Friend 1.  Yet Chief Byrne found that he "truthfully admit[ted] his wrongdoing" and imposed no discipline whatsoever for the deceptive statements.  Defendants attempt to explain the discrepancy by stressing that Comparator O was not under oath during the informal inquiry, and that he subsequently was truthful during the formal interrogation.  (Doc. 181, at 31).  Of course, Plaintiff was not under oath for his interrogation either, and a reasonable jury could conclude that both Plaintiff and Comparator O lied during the course of an investigation, and Chief Byrne decided to give Comparator O a pass by not mentioning his initial deception.  As noted earlier, Defendants' own cited case indicates that, had Comparator O received any discipline for his dishonesty, the LPD would have had to disclose that fact whenever he was involved in a criminal prosecution.  (Doc. 215, at 7) (citing *Milke*, 711 F.3d at 1012, 1019) (*Brady* requires the disclosure of any police personnel records reflecting discipline for lying or untruthfulness).

Plaintiff has presented sufficient evidence that Comparator O engaged in misconduct of comparable seriousness, and Defendants' motion in limine to exclude this evidence is denied.

## CONCLUSION

For the reasons stated here, Defendants' Motion in Limine to Bar Village of Lombard Police Officer Misconduct Incidents [181, 212] is granted in part and denied in part.

ENTER:

Dated: July 22, 2014

_____
SHEILA FINNEGAN
United States Magistrate Judge